SMITH *v.* KANSAS CITY TITLE & TRUST COMPANY ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

No. 199.   Argued January 6, 7, 8, 1920; restored to docket for reargument April 26, 1920; reargued October 14, 15, 1920.—Decided February 28, 1921.

1. A bill by a shareholder of a trust company to enjoin the directors from investing its funds in bonds of Federal Land Banks and Joint Stock Land Banks, upon the ground that the act of Congress authorizing the creation of such banks and the issue of such bonds is unconstitutional, and that the bonds therefore are not legal securities in which the company's funds may be lawfully invested, states a cause of action arising under the laws of the United States. P. 199.   Jud. Code, § 24.

2. The provisions of the Federal Farm Loan Act of July 17, 1916, c. 245, 39 Stat. 360, amended January 18, 1918, c. 9, 40 Stat. 431, making the Federal Land Banks and Joint Stock Land Banks

established thereunder depositaries of public money, when designated by the Secretary of the Treasury, authorizing their employment as financial agents of the Government, requiring them to perform, as such depositaries and agents, such reasonable duties as may be laid upon them, and authorizing them to purchase government bonds,—justify their creation as an exercise of the constitutional power of Congress. P. 208.

3. The necessity for such federal agencies is for Congress to determine, and the motives actuating Congress in exercising its power to create them are not a subject for judicial scrutiny. Pp. 209, 210.

4. The extent to which these institutions have so far been employed as government depositaries or fiscal agencies is irrelevant to the power to create them. P. 210.

5. Nor does their legitimacy depend on their being, technically, banks; or on the extent of their banking powers. *Id.*

6. The fact that these banks were intended to facilitate the making of loans upon farm security at low rates of interest does not invalidate the enactment. P. 211.

7. These banks being federal agencies, Congress had power to exempt their bonds from state, as well as federal, taxation. P. 212.

Affirmed.

THIS was a direct appeal to review a decree of the District Court dismissing a bill brought by a shareholder to enjoin a trust company from investing its money in bonds of Federal and Joint Stock, Land Banks. The case is stated in the opinion, *infra,* p. 195.

*Mr. William Marshall Bullitt* for appellant:

The implied power of appropriation does not authorize the creation of Federal Land Banks to lend private capital on farm mortgages, nor the exemption of their obligations in private hands from state taxation.

The power to borrow money on the credit of the United States does not authorize the issuance and sale of Farm Loan Bonds to private investors, nor the exemption thereof from state taxation.

Congress could not acquire power by the mere expedient of calling such corporations "Banks" and endowing them

with the possibility of acting as depositaries of public money or financial agents.

It must be remembered that we are considering a question of constitutional power. If, as the Government now contends, Congress has the power to create a possible depositary and fiscal agent and can declare its private business, and all obligations executed to or issued by it, exempt from taxation, certainly the principle supporting such action also authorizes Congress to designate individuals, firms and corporations as depositaries and fiscal agents, and thereby exempt their private business from state taxation. There is no pretense that the private business of the Farm Loan Banks is (as in *McCulloch* v. *Maryland*, 4 Wheat. 316, and *Osborn* v. *Bank*, 9 Wheat. 738), essential to the performance of governmental duties.

It must always be borne in mind that neither the Federal Land Banks nor the Joint Stock Banks can lend any assistance towards furnishing or regulating a sound currency; nor assist the Government in times of stress by furnishing liquid capital (from depositors' funds) to meet sudden governmental needs, nor indeed perform any of the functions which render the national banks so essential to governmental operations.

On the contrary, by the very nature of their long term loans, in times of financial stress or governmental need the Farm Loan Banks have to be helped by the Government. To-day, the Government has had to advance $175,000,000 to enable the Banks to operate; and at a time when the Government was having to pay 6 per cent. for its own borrowings!

Both the First and the Second Banks of the United States and the present national banks were created immediately after, or during, a great war, for the express purpose of affording the means for the execution of important express powers vested in Congress.

The First and Second Banks of the United States were

in fact the means actually used by the Government to carry on its fiscal operations; to obtain loans in anticipation of revenues; to facilitate the payment of federal taxes; to furnish a uniform and orderly currency on a sound specie basis; to collect, safeguard and transport money, and to transfer public funds from place to place (without cost to the Government or loss to it on account of the difference in exchange) as the exigencies of the Nation required. None of those functions can be performed by the Farm Loan Banks.

The Farm Loan Banks do not assist the Government to borrow money. To say they do, or can, is simply to ignore the plainest facts. Every dollar of their deposits (in the unlikely event of their stockholders making any deposits) must be invested in Farm Loan Bonds or farm mortgages. (§ 11.) They are not even permitted to invest their deposits in United States bonds.

Theoretically, the Farm Loan Banks have the power to invest the moneys received from the interest and amortization payments by the farmers, in United States bonds; but practically they would never do so, for such act would be at a loss and would operate to stop the system from functioning.

The basis of the *McCulloch* and *Osborn Cases* was not that the banks were mere passive depositaries or undefined financial agents, but was this: By virtue of engaging in general banking, they were enabled to perform a great many active and indispensable services essential to be performed in order to carry on government business.

In *McCulloch* v. *Maryland,* after holding that Congress could charter that particular bank because it was an appropriate means, plainly adapted to a legitimate end within the scope of the express powers granted by the Constitution, the Chief Justice emphasized the fact that in order to justify the incorporation of a bank it must be an appropriate measure to carry out express powers.

Again, in *Osborn* v. *Bank*, the great Chief Justice, while sustaining the validity of the bank's creation, notwithstanding the fact that it engaged in private business while carrying out its governmental functions, emphasized the fact that the bank was created primarily for national purposes and that it was necessary to allow it to do private business in order to effectively carry out the national purposes for which it was particularly created.

The Farm Loan Act expressly prohibits the Joint Stock Banks from receiving deposits or transacting any banking or other business except that of lending on farm mortgages; and prohibits the Federal Land Banks from receiving any deposits except from its stockholders who are also borrowers.

For what express national purposes were these Farm Loan Banks created? In what way is such national purpose dependent for its proper execution upon the lending of A's money to B at low rates, and exempting the transactions from state taxation? What fiscal operations of the Government are aided by the private business of farm mortgages? In what way is that branch of the business necessary to enable the Farm Loan Banks to perform any national purpose? In *First National Bank* v. *Union Trust Co.*, 244 U. S. 416, it was held that, in order to enable the bank successfully to perform its functions as a machine for the fiscal operations of the Government, Congress could authorize it to conduct such private banking business as tended to make it a more effective Government agent.

Can it be successfully contended that because Congress uses national banks as a means for the execution of conceded constitutional powers and may confer upon them private powers deemed necessary for the successful performance of their public duties, it is also competent for Congress primarily to confer such private powers upon a corporation which performs no public functions?

The farm mortgages executed to the Federal Land Banks and to the Joint Stock Land Banks, and the Farm Loan Bonds issued by them respectively, and held by the general investing public, are subject to state taxation.

There is no implied, as there certainly is no express, power, in Congress to exempt property from state taxation. If exemption exists it is because it is essential to some federal instrumentality to which the property belongs. It exists then by force of the Constitution, and it is for the court to declare it in applying the Constitution. And Congress cannot, by any declaration, create an exemption which would not have existed independently. *McCulloch* v. *Maryland,* 4 Wheat. 316, 425; *Osborn* v. *Bank,* 9 Wheat. 777, 794, 795; *Collector* v. *Day,* 11 Wall. 113, 123; *United States* v. *Railroad Co.,* 17 Wall. 322, 327; *Railroad Co.* v. *Peniston,* 18 Wall. 5, 30; *Dobbins* v. *Commissioners,* 16 Pet. 435, 447; *Van Brocklin* v. *Tennessee,* 117 U. S. 151, 157.

The authorities show that many instrumentalities of the Federal Government have been subjected to the power of state taxation, because, in the opinion of this court, such taxation did not interfere with their operations for the Government; that such exemption arises under the Constitution *ex proprio vigore;* that in the case of national banks Congress has expressly provided (Rev. Stats., § 5219) for the taxation of the shares of stock and the bank's real estate exactly as Marshall, J., held in *McCulloch* v. *Maryland* they could be taxed. A short review of the cases will show they are all consistent with these principles. It has repeatedly been held that the States may tax the property and operations of persons and corporations engaged in private business, although also employed by the Federal Government in the transaction of its business. *Hibernia Savings Society* v. *San Francisco,* 200 U. S. 310; *Thomson* v. *Pacific Railroad,* 9 Wall. 579;

*Railroad Co.* v. *Peniston*, 18 Wall. 5, 30–35; *Union Pacific R. R. Co.* v. *Lincoln County*, 1 Dill. 314; *Gromer* v. *Standard Dredging Co.*, 224 U. S. 362; *Baltimore Shipbuilding Co.* v. *Baltimore*, 195 U. S. 375, 382.

It is suggested (rather feebly it is true) that because the Farm Loan Banks were given the power to buy and sell United States bonds (a power that practically every individual and corporation, state or federal, possesses), they thereby became instrumentalities of the Federal Government and exempt from state taxation. If that argument were sound, every corporation and person who had the power to invest in or who invested in government securities, would be exempted with respect to the balance of his business from state taxation. *Monroe County Savings Bank* v. *City of Rochester*, 37 N. Y. 365, 370; *Plummer* v. *Coler*, 178 U. S. 115, 123.

*Mr. Frank Hagerman* for appellant:

There not having been expressly or by fair implication surrendered by the Constitution to Congress the power to create Land and Joint Stock Banks, such power must be deemed not to have been granted, but reserved to the States or to the people. Tenth Amendment; *United States* v. *Harris*, 106 U. S. 629, 630, 636; *Collector* v. *Day*, 11 Wall. 113, 124; *McCulloch* v. *Maryland*, 4 Wheat. 316, 405, 410; *Osborn* v. *Bank*, 9 Wheat. 738; *Bank* v. *Dearing* 91 U. S. 29; *First National Bank* v. *Union Trust Co.*, 244 U. S. 416; *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 325; *Chisholm* v. *Georgia*, 2 Dall. 419, 435, 448; *Ableman* v. *Booth*, 21 How. 506, 516; *Dobbins* v. *Erie County Commissioners*, 16 Pet. 435, 447; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 178; *United States* v. *Cruikshank*, 92 U. S. 542, 549; *Claflin* v. *Houseman*, 93 U. S. 130, 136; *License Tax Cases*, 5 Wall. 462, 470; *Slaughter-House Cases*, 16 Wall. 36, 62; *Leisy* v. *Hardin*, 135 U. S. 100, 127; Cooley, Const. Lim., 7th ed., 831; *Hammer* v. *Dagenhart*, 247

180. Argument of Mr. Hagerman for Appellant.

U. S. 251, 255; *Kansas* v. *Colorado*, 206 U. S. 46, 87, 88.

Appellees radically differ in their contentions. The Joint Stock Banks seek to support the power upon the basis of a purpose to create agencies to perform governmental functions; the Land Banks, upon the inherent right of the Government to appropriate its public money for any public purpose. The real and only purpose of the act was to enable owners of farm land, not necessarily farmers, to borrow, for any purpose, money on farm mortgages for very long terms at extremely low rates of interest. This is clearly shown by its language as well as by the congressional debates, and by the governmental literature and official announcements. As correctly declared by Senator Cummins in debate (53 Cong. Rec. 7246), "the chief purpose is to secure a lower rate of interest to those who borrow; that is its only object." That the scheme was, in fact, private in its nature and not governmental, is also apparent from every provision of the act.

In the case of the Joint Stock Banks, there is not even the flimsy pretense (which is claimed to exist in the case of the Land Banks) that the power of appropriation was exercised or that the money raised by the mortgages was to be used for agricultural development. There was for them no appropriation and there is no limit or restriction whatever as to the purposes for which the money loaned may be used, as those banks are expressly exempted from the limitations imposed upon Land Banks in that respect. Even the coöperative and collective plan of borrowing by the farmers, the joint and several liability of the banks, and the degree of federal supervision, which exist in the case of the Land Banks, and were the strongest arguments advanced in Congress in favor of the act,—were specifically dispensed with in the case of the Joint Stock Banks, because it was thought that some farmers might object to a coöperative undertaking with their neighbors, or to the publicity and scrutiny thereby entailed. Senate

Rep. 144, p. 11; House Rep. 630, p. 910; 1st Annual Rep. of Federal Farm Loan Board, p. 22.

These banks are expressly prohibited from receiving deposits or doing any banking or other business (§ 16).

But the functions of Land Banks are also purely private. The farm mortgages executed to both classes of banks and the bonds issued by them thereon, and held by private investors, are wholly instruments of private business. They, like the Joint Stock Banks (§ 16), can do no banking (§ 14), and do not possess any of the characteristics of those institutions which have ever been held to be instrumentalities of the Government. The bonds of both classes of banks are neither assets nor liabilities of the United States. It does not promise to pay or guarantee the payment of them. The money raised thereon does not go to it.

Not only were the agencies intended to be strictly private, but there was a distinct purpose not to appropriate public money or lend it on the credit of the Government.

The congressional debates and committee reports and the government official announcements all show that there was actually no real purpose to provide necessary and essential governmental agencies, nor to appropriate money nor lend any public credit. They do, however, affirmatively show, as Senator Cummins (53 Cong. Rec. 7246) stated, and the House Committee (64th Cong., 1st sess., Report No. 630) reported, that the sole and only object sought to be attained was to give the farmers long-time loans on farm mortgages at low interest rates.

It would therefore seem impossible to conceive that Congress, in fact, ever intended to exercise either of the two alleged powers about the existence of which counsel so radically differ.

The act cannot be sustained on the theory of the Joint Stock Banks, that it was an exercise of the power to establish agencies to perform necessary and essential governmental functions.

If the agencies established were not, in fact, general banks, or, regardless of what they were, if their main purpose was not to exercise necessary and essential governmental functions, to which private business was a mere incident, the premise on which the proposition rests wholly fails. *South Carolina* v. *United States*, 199 U. S. 437, and the national bank cases, when properly applied, are conclusive authorities in support of this view.

"A mere possibility" that either of the alleged banks might, under § 6, be unnecessarily used in the future for some minor governmental purpose does not make it "an agency of the United States." *Baltimore Shipbuilding Co.* v. *Baltimore*, 195 U. S. 375, 382; *Second Employers' Liability Cases*, 223 U. S. 1. The agency must be necessary and essential to aid the Government in performing governmental duties. *McCulloch* v. *Maryland*, 4 Wheat. 316, 423; *Osborn* v. *Bank*, 9 Wheat. 738, 860, 861, 863; *Farmers' & Mechanics' Bank* v. *Dearing*, 91 U. S. 29, 33; *First National Bank* v. *Union Trust Co.*, 244 U. S. 416, 425.

The reasons for the establishment of national banks to perform necessary and essential governmental functions clearly show that neither the Land nor the Joint Stock Banks were created as agencies for such purposes. Unless they were, there is not authority in Congress to establish them. *Osborn* v. *Bank*, 9 Wheat. 738, 860. The fact that unnecessarily they may possibly, if and when desired, be called upon to perform a minor governmental function is not sufficient. Banks are not unknown things. They are capable of being and have frequently been defined. The very definition, so far as concerns the exercise of a governmental function, is well understood. All the powers of a State or the United States are either governmental or else private and proprietary. These two classes of powers are well defined, quite distinct and fully recognized. *South Carolina* v. *United States*, 199 U. S. 437, 461, 462; *First National Bank* v.

*Union Trust Co.,* 244 U. S. 416; *Illinois Trust & Savings Bank* v. *Arkansas City,* 76 Fed. Rep. 271, 282.

The money which the Government advanced to the Land Banks as a loan to make the initial stock payment, did not convert the scheme into one of a governmental nature. The fact that the agencies provided were actually named banks, or called instrumentalities of the Government, does not prevent an inquiry into the unquestionable fact that they were not in reality such.

The attempt by § 6 to provide for possible service to the Government was a subterfuge and merely a scheme to evade the Constitution. The section does not require but only permits the banks to be designated as depositaries of public money and their employment as financial agents of the Government. The law made no such designation nor any such requirement. Both agencies might forever exist without either of them ever being so designated or employed. All government funds, if deposited in any such depositary or financial agency, must be kept separate and apart from any other funds and cannot be invested in farm mortgages or bonds. It is wholly immaterial that some artful mind may have suggested, as indicated (53 Cong. Rec. 7246), the insertion of this section to give to the scheme a color that governmental functions were to be performed. It is sufficient to say they were not the main purpose of the scheme. If anything, they were possibilities, and if availed of, mere incidents, wholly non-essential and unnecessary to the main purpose.

This view accords with the practical working of the act.

The passage of the act cannot, as contended for by the Land Banks, be sustained as an exercise of the power to appropriate the public money for public purposes.

If, of course, the act is unconstitutional as to either class of banks, no tax exemption can, as to that bank, be upheld. *Norton* v. *Shelby County,* 118 U. S. 425.

While real governmental instrumentalities are exempt and should be exempted from state taxation (Willoughby on Constitution, § 45, *et-seq.*), the exemption should never be lightly extended. *Thomson* v. *Pacific Railroad,* 9 Wall. 579.

There must, therefore, be an actual and essential governmental instrumentality before, without more, it is or can by Congress be made exempt from any state tax. Any restriction upon the State's power to tax arises from the operation of the Constitution itself. Congress cannot, by any declaration of exemption, create one that would not have equally existed without it. In other words, any attempt by Congress to exempt property from state taxation, if valid, is merely declaratory of what the exemption would have been anyway, without such declaration.

The principle underlying the cases is that neither the state nor Federal Government can tax the property or operations of any essential governmental instrumentality of the other. The reason why the States can tax the property and business of railroads, telegraph lines, etc., although they may have been chartered by Congress and used in part as governmental instrumentalities, and yet cannot similarly tax national banks, lies in this distinction between the two instrumentalities: The railroad and telegraph lines could, in fact, perform all the services for the Federal Government just as well without the addition of private business as they can with it (except as a money making proposition); and hence in accordance with the express language of *Osborn* v. *Bank,* 9 Wheat. 738, 861, the property and private operations of the companies are generally taxable by the State. The banks, as pointed out in that case and in *McCulloch* v. *Maryland,* 4 Wheat. 316, could only satisfactorily perform their essential governmental duties by being endowed with the right to transact private business; as private banking

business was the very thing which was needed to enable them to be an efficient machine for carrying out their fiscal operations.

A Joint Stock Bank, acting as a depositary, could, like the railroads, perform such a function just as satisfactorily to the Government without, as with, the addition of private business.

The mere possibility that at some future time the United States may elect to designate a Land or Joint Stock Bank as a depositary and thereafter may further elect actually to use it as such, while in the meantime the corporation is engaged solely in private business for private gain, certainly does not constitute the corporation such an essential instrumentality of the Federal Government as to exempt it from state taxation. *Baltimore Shipbuilding Co. v. Baltimore*, 195 U. S. 375, 382.

*Mr. Charles E. Hughes* for Federal Land Bank of Wichita, Kansas, appellee:

Congress had power to use the public money, and to provide for the borrowing of money to aid in agricultural development throughout the country in accordance with the systematic and general plan to promote the cultivation of the soil, involving the application of money through loans or otherwise.

Congress was not limited to the use of public moneys by outright appropriations, but, having that authority, could create a revolving fund to be used through loans. The purpose thus subserved through the provisions of the act was a public purpose.

The Farm Loan Act deals with pecuniary aid alone, that is, it is concerned only with the application of money.

The purposes in view are public, not private; national, not local.

Having this power, with respect to the use of money, Congress could exercise the power by the adoption of

appropriate means to that end and the creation of instrumentalities for that purpose.

Congress has the power to judge for itself what fiscal agencies the Government needs and its decision of that question is not open to judicial review. Congress may create in its discretion, as in this instance it has created, moneyed institutions to serve as fiscal agents of the Government and also to provide a market, as stated in the act, for United States bonds.

Congress may protect the securities created under its legislation, from impairment or destruction, by making them exempt from taxation.

*Mr. W. W. Willoughby* filed a separate brief on behalf of the Federal Land Bank of Wichita, Kansas, appellee.

*Mr. George W. Wickersham,* with whom *Mr. W. G. Mc-Adoo* was on the briefs, for First Joint Stock Land Bank of Chicago, appellee:

There is no essential difference between the Federal Land Banks and the Joint Stock Land Banks so far as congressional authority for their creation is concerned.

The burden is upon appellant to establish the unconstitutionality of the Farm Loan Act beyond a reasonable doubt.

Appellant's attack on the constitutionality of the Farm Loan Act is based upon the erroneous hypothesis that the banks provided for in it are private institutions, established for a private purpose. This fallacy runs throughout his argument.

The Farm Loan Banks of both classes are banking instrumentalities lawfully created by Congress for a public purpose, namely, that of facilitating the fiscal operations of the Government. They are designed to relieve the national banks from the demands of long-time agricultural credits. The operations of the banks

have an influence upon public credit scarcely less important to the fiscal operations of the Government than that which led to the creation of the United States banks and the national banks.

The general purposes of the Farm Loan Act might have been attained by Congress through the direct exercise of the powers of taxation and borrowing.

Having the power to raise money for the purposes under consideration by taxation or borrowing, and to apply it directly, through the Treasury, or other department, Congress may accomplish the same ends through corporate instrumentalities adapted to or created for the purpose.

Since *McCulloch* v. *Maryland* and *Osborn* v. *Bank*, the power of Congress to create corporations to execute its powers is unquestionable.

Private stockholding in Farm Loan Banks does not make the enterprise a private one.

Congress is sole judge of the powers it shall confer on a corporation lawfully created by it.

The banks of the Farm Loan System were created for public purposes.

Having created land banks for these lawful purposes, Congress also has power to adapt them to other legitimate federal purposes.

The provisions exempting from taxation, state or federal, the mortgages executed to secure loans made by Federal Land Banks or Joint Stock Land Banks, and Farm Loan Bonds issued by either class of banks, under the provisions of the Farm Loan Act, and the income derived therefrom, are within the powers of Congress to enact.

Congress might constitutionally have created both classes of banks to serve as depositaries of public moneys and financial agents of the Government. That it chose also to empower them to loan moneys on farm mort-

gages, even if that were not within its power to grant as a sole and distinct object, would not impair the legality of the incorporation, nor the power of Congress to protect them against national and state taxation.

The Farm Loan Act was passed after great consideration and discussion. Vast amounts have been invested in reliance upon it. Entire absence of constitutional power must be demonstrated beyond controversy before this court will declare worthless millions of securities issued on the faith of congressional authority.

Mr. *Justin D. Bowersock* filed a brief on behalf of Kansas City Title & Trust Company, appellee.

The *Solicitor General, Mr. W. G. McAdoo*, Special Assistant to the Attorney General, and *Mr. J. P. Cotton*, by leave of court, filed a brief on behalf of the United States as *amici curiæ*.[1]

MR. JUSTICE DAY delivered the opinion of the court.

A bill was filed in the United States District Court for the Western Division of the Western District of Missouri by a shareholder in the Kansas City Title & Trust Company to enjoin the Company, its officers, agents and employees from investing the funds of the Company in farm loan bonds issued by Federal Land Banks or Joint Stock Land Banks under authority of the Federal Farm Loan Act of July 17, 1916, c. 245, 39 Stat. 360, as amended January 18, 1918, c. 9, 40 Stat. 431.

The relief was sought on the ground that these acts were beyond the constitutional power of Congress. The bill avers that the Board of Directors of the Company are

---

[1] At the first hearing *Mr. Solicitor General King* and *Mr. W. G. McAdoo*, by leave of court, filed a brief on behalf of the United States as *amici curiæ*.

about to invest its funds in the bonds to the amount of $10,000 in each of the classes described, and will do so unless enjoined by the court in this action. The bill avers the formation of twelve Federal Land Banks, and twenty-one Joint Stock Land Banks under the provisions of the act.

As to the Federal Land Banks, it is averred that each of them has loaned upon farm lands large amounts secured by mortgage, and, after depositing the same with the Farm Loan Registrar, has executed and issued collateral trust obligations called Farm Loan Bonds, secured by the depositing of an equivalent amount of farm mortgages and notes; and that each of said Federal Land Banks has sold, and is continuing to offer for sale, large amounts of said Farm Loan Bonds. The bill also avers that various persons in different parts of the United States have organized twenty-one Joint Stock Land Banks, the capital stock of which is subscribed for and owned by private persons; that the Joint Stock Land Banks have deposited notes and mortgages with the Farm Loan Registrar, and issued an equivalent amount of collateral trust obligations called Farm Loan Bonds, which have been sold and will be continued to be offered for sale to investors in large amounts in the markets of the country. A statement is given of the amount of deposits by the Secretary of the Treasury with the Federal Land Banks, for which the banks have issued their certificates of indebtedness bearing interest at 2%. per annum. It is averred that on September 30, 1919, Federal Land Banks owned United States bonds of the par value of $4,230,805; and the Joint Stock Land Banks owned like bonds of the par value of $3,287,503 on August 31, 1919; that pursuant to the provisions of the act the Secretary of the Treasury has invested $8,892,130 of the public funds in the capital stock of the Federal Land Banks, and that on July 1, 1919, the Secretary of the Treasury on behalf of the United States held $8,265,809 of the capital stock of the Federal Land Banks;

that pursuant to the provisions of § 32 of the act, as amended, the Secretary of the Treasury has purchased Farm Loan Bonds issued by the Federal Land Banks of the par value of $149,775,000; that up to September 30, 1919, bonds have been issued under the act by the Federal Land Banks to the amount of $285,600,000, of which about $135,000,000 are held in the Treasury of the United States, purchased under the authority of the amendment of January 18, 1918; that up to September 30, 1919, twenty-seven Joint Stock Land Banks have been incorporated under the act, having an aggregate capital of $8,000,000, all of which has been subscribed and $7,450,000 paid in; that bonds have been issued by Joint Stock Land Banks to the amount of $41,000,000, which are now in the hands of the public; that the Secretary of the Treasury up to the time of the filing of the bill has not designated any of the Federal Land Banks nor the Joint Stock Land Banks as depositaries of public money, nor, except as stated later in the bill, has he employed them or any of them as financial agents of the Government, nor have they or any of them performed any duties as depositaries of public money, nor have they or any of them accepted any deposits or engaged in any banking business. The bill avers that during the summer of 1918 the Federal Land Banks at Wichita, St. Paul and Spokane were designated as financial agents of the Government for making seed grain loans to farmers in drought-stricken sections, the President having at the request of the Secretary of Agriculture set aside $5,000,000 for that purpose out of the $100,000,000 war funds. The three banks mentioned made upwards of 15,000 loans of that character, aggregating a sum upwards of $4,500,000, and are now engaged in collecting these loans, all of which are secured by crop liens; that these banks act in that capacity without compensation, receiving only the actual expenses incurred.

Section 27 of the act provides that Farm Loan Bonds

issued under the provisions of the act by Federal Land Banks or Joint Stock Land Banks shall be a lawful investment for all fiduciary and trust funds, and may be accepted as security for all public deposits. The bill avers that the defendant Trust Company is authorized to buy, invest in and sell government, state and municipal and other bonds, but it cannot buy, invest in or sell any such bonds, papers, stocks or securities which are not authorized to be issued by a valid law or which are not investment securities, but that nevertheless it is about to invest in Farm Loan Bonds; that the Trust Company has been induced to direct its officers to make the investment by reason of its reliance upon the provisions of the Farm Loan Acts, especially §§ 21, 26 and 27, by which the Farm Loan Bonds are declared to be instrumentalities of the Government of the United States, and as such with the income derived therefrom, are declared to be exempt from federal, state, municipal and local taxation, and are further declared to be lawful investments for all fiduciary and trust funds. The bill further avers that the acts by which it is attempted to authorize the bonds are wholly illegal, void and unconstitutional and of no effect because unauthorized by the Constitution of the United States.

The bill prays that the acts of Congress authorizing the creation of the banks, especially §§ 21, 26 and 27 thereof, shall be adjudged and decreed to be unconstitutional, void and of no effect, and that the issuance of the Farm Loan Bonds, and the taxation exemption feature thereof, shall be adjudged and decreed to be invalid.

The First Joint Stock Land Bank of Chicago and the Federal Land Bank of Wichita, Kansas, were allowed to intervene and became parties defendant to the suit. The Kansas City Title & Trust Company filed a motion to dismiss in the nature of a general demurrer, and upon hearing the District Court entered a decree dismissing the bill. From this decree appeal was taken to this court.

No objection is made to the federal jurisdiction, either original or appellate, by the parties to this suit, but that question will be first examined. The Company is authorized to invest its funds in legal securities only. The attack upon the proposed investment in the bonds described is because of the alleged unconstitutionality of the acts of Congress undertaking to organize the banks and authorize the issue of the bonds. No other reason is set forth in the bill as a ground of objection to the proposed investment by the Board of Directors acting in the Company's behalf. As diversity of citizenship is lacking, the jurisdiction of the District Court depends upon whether the cause of action set forth arises under the Constitution or laws of the United States. Judicial Code, § 24.

The general rule is that where it appears from the bill or statement of the plaintiff that the right to relief depends upon the construction or application of the Constitution or laws of the United States, and that such federal claim is not merely colorable, and rests upon a reasonable foundation, the District Court has jurisdiction under this provision.

At an early date, considering the grant of constitutional power to confer jurisdiction upon the federal courts, Chief Justice Marshall said: "A case in law or equity consists of the right of the one party, as well as of the other, and may truly be said to arise under the Constitution or a law of the United States, whenever its correct decision depends on the construction of either," *Cohens* v. *Virginia*, 6 Wheat. 264, 379; and again, when "the title or right set up by the party may be defeated by one construction of the Constitution or law of the United States, and sustained by the opposite construction." *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 822. These definitions were quoted and approved in *Patton* v. *Brady*, 184 U. S. 608, 611, citing *Gold-Washing Co.* v. *Keyes*, 96 U. S. 199, 201; *Tennessee* v. *Davis*, 100 U. S. 257; *White* v. *Greenhow*, 114 U. S. 307; *Railroad Company* v. *Mississippi*, 102 U. S. 135, 139.

This characterization of a suit arising under the Constitution or laws of the United States has been followed in many decisions of this and other federal courts. See *Macon Grocery Co.* v. *Atlantic Coast Line R. R. Co.*, 215 U. S. 501 506, 507; *Shulthis* v. *McDougal*, 225 U. S. 561, 569, paragraph 3. The principle was applied in *Brushaber* v. *Union Pacific R. R. Co.*, 240 U. S. 1, in which a shareholder filed a bill to enjoin the defendant corporation from complying with the income tax provisions of the Tariff Act of October 3, 1913. In that case while there was diversity of citizenship, a direct appeal to this court was sustained because of the constitutional questions raised in the bill, which had been dismissed by the court below. The repugnancy of the statute to the Constitution of the United States, as well as grounds of equitable jurisdiction, were set forth in the bill, and the right to come here on direct appeal was sustained because of the averments based upon constitutional objections to the act. Reference was made to *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, where a similar shareholder's right to sue was maintained, and a direct appeal to this court from a decree of the Circuit Court was held to be authorized.

In the *Brushaber Case* the Chief Justice, speaking for the court, said:

"The right to prevent the corporation from returning and paying the tax was based upon many averments as to the repugnancy of the statute to the Constitution of the United States, of the peculiar relation of the corporation to the stockholders and their particular interests resulting from many of the administrative provisions of the assailed act, of the confusion, wrong and multiplicity of suits and the absence of all means of redress which would result if the corporation paid the tax and complied with the act in other respects without protest, as it was alleged it was its intention to do. To put out of the way a question of jurisdiction we at once say that in view of these averments and

the ruling in *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, sustaining the right of a stockholder to sue to restrain a corporation under proper averments from voluntarily paying a tax charged to be unconstitutional on the ground that to permit such a suit did not violate the prohibitions of § 3224, Rev. Stat., against enjoining the enforcement of taxes, we are of opinion that the contention here made that there was no jurisdiction of the cause since to entertain it would violate the provisions of the Revised Statutes referred to is without merit.   .   .   .

"Aside from averments as to citizenship and residence, recitals as to the provisions of the statute and statements as to the business of the corporation contained in the first ten paragraphs of the bill advanced to sustain jurisdiction, the bill alleged twenty-one constitutional objections specified in that number of paragraphs or subdivisions. As all the grounds assert a violation of the Constitution, it follows that in a wide sense they all charge a repugnancy of the statute to the Sixteenth Amendment under the more immediate sanction of which the statute was adopted."

The jurisdiction of this court is to be determined upon the principles laid down in the cases referred to. In the instant case the averments of the bill show that the directors were proceeding to make the investments in view of the act authorizing the bonds about to be purchased, maintaining that the act authorizing them was constitutional and the bonds valid and desirable investments. The objecting shareholder avers in the bill that the securities were issued under an unconstitutional law, and hence of no validity. It is, therefore, apparent that the controversy concerns the constitutional validity of an act of Congress which is directly drawn in question. The decision depends upon the determination of this issue.

The general allegations as to the interest of the shareholder, and his right to have an injunction to prevent the purchase of the alleged unconstitutional securities by mis-

application of the funds of the corporation, give jurisdiction under the principles settled in *Pollock* v. *Farmers' Loan & Trust Co.*, and *Brushaber* v. *Union Pacific R. R. Co., supra.* We are, therefore, of the opinion that the District Court had jurisdiction under the averments of the bill, and that a direct appeal to this court upon constitutional grounds is authorized.

We come to examine the questions presented by the attack upon the constitutionality of the legislation in question. The Federal Farm Loan Act is too lengthy to set out in full. It is entitled: "An Act To provide capital for agricultural development, to create standard forms of investment based upon farm mortgage, to equalize rates of interest upon farm loans, to furnish a market for United States bonds, to create Government depositaries and financial agents for the United States, and for other purposes."

The administration of the act is placed under the direction and control of a Federal Farm Loan Bureau established at the seat of Government in the Treasury Department, under the general supervision of the Federal Farm Loan Board, consisting of the Secretary of the Treasury and four members appointed by the President by and with the advice and consent of the Senate. The United States is divided into twelve districts for the purpose of establishing Federal Land Banks. Each of the banks must have a subscribed capital of not less than $750,000, divided into shares of $5.00 each, which may be subscribed for by any individual, firm or corporation, or by the government of any State, or of the United States. No dividends shall be paid on the stock owned by the United States, but all other stock shall share in dividend distributions without preference. The Federal Farm Loan Board is to designate five directors who shall temporarily manage the affairs of each Federal Land Bank, and who shall prepare an organization certificate which, when approved by the Federal Farm Loan Board and filed with the Farm Loan Commissioner,

shall operate to create the bank a body corporate. The Federal Farm Loan Board is required to open books of subscription for the capital stock of each Federal Land Bank, and, if within thirty days thereafter any part of the minimum capitalization of $750,000 of any such bank shall remain unsubscribed, it is made the duty of the Secretary of the Treasury to subscribe the balance on behalf of the United States.

The amendment of January 18, 1918, authorizes the Secretary of the Treasury to purchase bonds issued by Federal Land Banks, and provides that the temporary organization of any such bank shall be continued so long as any Farm Loan Bonds shall be held by the Treasury, and until the subscription to stock in such bank by National Farm Loan Associations shall equal the amount of the stock held by the United States Government. When these conditions are complied with a permanent organization is to take over the management of the bank consisting of a Board of Directors composed of nine members, three of whom shall be known as district directors and shall be appointed by the Farm Loan Board, who shall represent the public interest, six of whom to be known as local directors, shall be chosen by, and be representative of National Farm Loan Associations.

Federal Land Banks are empowered to invest their funds in the purchase of qualified first mortgages on farm lands situated within the Federal Land Bank District within which they are organized or acting. Loans on farm mortgages are to be made to coöperative borrowers through the organization of corporations known as National Farm Loan Associations, by persons desiring to borrow money on farm mortgage security under the terms of the act. Ten or more natural persons who are the owners of or are about to become the owners of farm land qualified as security for mortgage loans, and who desire to borrow money on farm mortgage security, may unite to form a National Farm

Loan Association. The manner of forming these associa- tions, and the qualifications for membership, are set out in the act.

A loan desired by each such person must be for not more than $10,000 nor less than $100, and the aggregate of the desired loans not less than $20,000. The application for loan must be accompanied by subscriptions to stock of a Federal Land Bank equal to 5% of the aggregate sum desired on the mortgage loan. Provision is made for appraisal of the land, and report to the Federal Farm Loan Board. No persons but borrowers on farm loan mortgages shall be members or shareholders of National Farm Loan Associations.

Shareholders in Farm Loan Associations are made individually responsible for the debts of the Association to the extent of the amount of the stock owned by them respectively, in addition to the amount paid in and represented by their shares.

When any National Farm Loan Association shall desire to secure for any member a loan on first mortgage from the Federal Land Bank in its district, it must subscribe to the capital stock of the Federal Land Bank to an amount of 5% of such loan, which capital stock shall be held by the Federal Land Bank as collateral security for the payment of the loan, the Association shall be paid any dividends accruing and payable on the capital stock while it is outstanding. Such stock may, in the discretion of the directors and with the approval of the Federal Farm Loan Board, be paid off at par and retired, and shall be so retired upon the full payment of the mortgage loan. In such event, the National Farm Loan Association must pay off at par and retire the corresponding shares of its stock which were issued when the Land Bank stock so retired was issued; but it is further provided that the capital stock of the Land Bank shall not be reduced to less than 5% of the principal of the outstanding Farm

Loan Bonds issued by it. The shares in National Farm
Loan Associations shall be of the par value of $5.00 each.

At least 25% of that part of the capital of any Federal
Land Bank for which stock is outstanding in the name of
National Farm Loan Associations must be held in quick
assets. Not less than 5% of such capital must be invested
in United States Government Bonds.

The loans which Federal Land Banks may make upon
first mortgages on farm lands are provided for in § 12 of the
act. By § 13 these banks are empowered, subject to the
provisions of the act, to issue and sell Farm Loan Bonds
of the kind described in the act, and to invest funds
in their possession in qualified first mortgages on farm
lands, to receive and to deposit in trust with the Farm
Loan Registrar, to be held by him as collateral se-
curity for Farm Loan Bonds, first mortgages upon farm
lands, and, with the approval of the Farm Loan Board, to
issue and to sell their bonds secured by the deposit of first
mortgages on qualified farm lands as collateral, in con-
formity with the provisions of § 18 of the act. By the
amendment of January 18, 1918, the Secretary of the
Treasury was empowered during the years 1918 and 1919,
to purchase Farm Loan Bonds issued by Federal Land
Banks to an amount not exceeding $100,000,000 each year,
and any Federal Land Bank was authorized at any time to
repurchase at par and accrued interest, for the purpose of
redemption or resale, any of the bonds so purchased from
it and held in the United States Treasury.

It is also provided that the bonds of any Federal Land
Bank so purchased and held in the Treasury one year
after the termination of the pending war shall, upon thirty
days' notice from the Secretary of the Treasury, be re-
deemed and repurchased by such bank at par and accrued
interest. By § 15 it is provided that whenever, after the
act shall have been in effect for one year, it shall appear to
the Federal Farm Loan Board that National Farm Loan

Associations have not been formed and are not likely to be formed, in any locality, because of peculiar local conditions, the Board may in its discretion authorize Federal Land Banks to make loans on farm lands through agents approved by the Board, on the terms and conditions and subject to the restrictions prescribed in that section.

The act also authorizes the incorporation of Joint Stock Land Banks, with capital provided by private subscription. They are organized by not less than ten natural persons, and are subject to the requirements of the provisions of § 4 of the act so far as applicable. The board of directors shall consist of not less than five members. Each shareholder shall have the same voting privileges as the holders of shares in National Banking Associations, and shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such bank to the extent of the amount of stock owned by them at the par value thereof, in addition to the amount paid in and represented by their shares. The Joint Stock Land Bank is authorized to do business when capital stock to the amount of $250,000 has been subscribed, and one-half paid in cash, the balance remaining subject to call by the board of directors, the charter to be issued by the Federal Farm Loan Board. No bonds shall be issued until the capital stock is entirely paid up. Except as otherwise provided, Joint Stock Land Banks shall have the powers of and be subject to all the restrictions and conditions imposed on Federal Land Banks by the act, so far as such conditions or restrictions are applicable.

Federal Land Banks may issue Farm Loan Bonds up to twenty times their capital and surplus. Joint Stock Land Banks are limited to the issue of Farm Loan Bonds not in excess of fifteen times the amount of their capital and surplus. Joint Stock Land Banks can only loan on first mortgages upon land in the State where located, or in a State

contiguous thereto. No loan on mortgage may be made by any bank at a rate exceeding 6% per annum exclusive of amortization payments. Joint Stock Land Banks shall in no case charge a rate of interest on farm loans which shall exceed by more than 1% the rate established by the last series of Farm Loan Bonds issued by them, which rate shall not exceed 5% per annum.

Provisions for the issue of Farm Loan Bonds secured by first mortgages on farm lands or United States bonds, as collateral, are made for Federal Land Banks and Joint Stock Land Banks; in each case the issue is made subject to the approval of the Federal Farm Loan Board. The farm loan mortgages, or United States bonds, which constitute the collateral security for the bonds, must be deposited with the Farm Loan Registrar.

Section 26 of the act provides as follows: "That every Federal land bank and every national farm loan association, including the capital and reserve or surplus therein and the income derived therefrom, shall be exempt from Federal, State, municipal, and local taxation, except taxes upon real estate held, purchased, or taken by said bank or association under the provisions of section eleven and section thirteen of this Act. First mortgages executed to Federal land banks, or to joint stock land banks, and farm loan bonds issued under the provisions of this Act, shall be deemed and held to be instrumentalities of the Government of the United States, and as such they and the income derived therefrom shall be exempt from Federal, State, municipal, and local taxation.

"Nothing herein shall prevent the shares in any joint stock land bank from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the State within which the bank is located; but such assessment and taxation shall be in manner and subject to the conditions and limitations contained in section fifty-two

hundred and nineteen of the Revised Statutes with refer-
ence to the shares of national banking associations.

"Nothing herein shall be construed to exempt the real
property of Federal and joint stock land banks and na-
tional farm loan associations from either State, county,
or municipal taxes, to the same extent, according to its
value, as other real property is taxed."

. Since the decision of the great cases of *McCulloch* v.
*Maryland*, 4 Wheat. 316, and *Osborn* v. *Bank*, 9 Wheat.
738, it is no longer an open question that Congress may
establish banks for national purposes, only a small part
of the capital of which is held by the Government, and a
majority of the ownership in which is represented by
shares of capital stock privately owned and held; the
principal business of such banks being private banking
conducted with the usual methods of such business.
While the express power to create a bank or incorporate
one is not found in the Constitution, the court, speaking
by Chief Justice Marshall, in *McCulloch* v. *Maryland*,
found authority so to do in the broad general powers
conferred by the Constitution upon the Congress to levy
and collect taxes, to borrow money, to regulate commerce,
to pay the public debts, to declare and conduct war, to
raise and support armies, and to provide and maintain a
navy, etc. Congress it was held had authority to use
such means as were deemed appropriate to exercise the
great powers of the Government by virtue of Article I,
§ 8, cl. 18, of the Constitution granting to Congress the
right to make all laws necessary and proper to make the
grant effectual. In *First National Bank* v. *Union Trust
Co.*, 244 U. S. 416, 419, the Chief Justice, speaking for
the court, after reviewing *McCulloch* v. *Maryland*, and
*Osborn* v. *Bank*, and considering the power given to Con-
gress to pass laws to make the specific powers granted
effectual, said:.

"In terms it was pointed out that this broad authority

was not stereotyped as of any particular time but endured, thus furnishing a perpetual and living sanction to the legislative authority within the limits of a just discretion enabling it to take into consideration the changing wants and demands of society and to adopt provisions appropriate to meet every situation which it was deemed required to be provided for."

That the formation of the bank was required in the judgment of the Congress for the fiscal operations of the Government, was a principal consideration upon which Chief Justice Marshall rested the authority to create the bank; and for that purpose being an appropriate measure in the judgment of the Congress, it was held not to be within the authority of the court to question the conclusion reached by the legislative branch of the Government.

Upon the authority of *McCulloch* v. *Maryland*, and *Osborn* v. *Bank*, the national banking system was established, and upon them this court has rested the constitutionality of the legislation establishing such banks. *Farmers' & Mechanics' National Bank* v. *Dearing*, 91 U. S. 29, 33, 34.

Congress has seen fit in § 6 of the act to make both classes of banks, when designated for that purpose by the Secretary of the Treasury, depositaries of public money, except receipts from customs, under regulations to be prescribed by the Secretary of the Treasury, and has authorized their employment as financial agents of the Government, and the banks are required to perform such reasonable duties, as depositaries of public moneys and financial agents as may be required of them. The Secretary of the Treasury shall require of the Federal Land Banks and the Joint Stock Land Banks, thus designated, satisfactory security, by the deposit of United States bonds or otherwise, for the safe-keeping and prompt payment of the public money deposited with them, and

for the faithful performance of their duties as the finan-
cial agents of the Government.

Section 6 also provides that no government funds de-
posited under the provisions of the section shall be in-
vested in mortgage loans or Farm Loan Bonds.

It is said that the power to designate these banks as
such depositaries has not been exercised by the Govern-
ment, and that the Federal Land Banks have acted as
federal agents only in the case of loans of money for seed
purposes made in the summer of 1918, to which we have
already referred. But the existence of the power under the
Constitution is not determined by the extent of the
exercise of the authority conferred under it. Congress
declared it necessary to create these fiscal agencies, and
to make them authorized depositaries of public money.
Its power to do so is no longer open to question.

But, it is urged, the attempt to create these federal
agencies, and to make these banks fiscal agents and public
depositaries of the Government, is but a pretext. But
nothing is better settled by the decisions of this court
than that when Congress acts within the limits of its con-
stitutional authority, it is not the province of the judicial
branch of the Government to question its motives.
*Veazie Bank* v. *Fenno*, 8 Wall. 533, 541; *McCray* v. *United
States*, 195 U. S. 27; *Flint* v. *Stone Tracy Co.*, 220 U. S.
107, 147, 153, 156, and cases cited.

That Congress has seen fit, in making these banks fiscal
agencies and depositaries of public moneys, to grant
to them banking powers of a limited character, in no-
wise detracts from the authority of Congress to use
them for the governmental purposes named, if it sees fit
to do so. A bank may be organized with or without the
authority to issue currency. It may be authorized to
receive deposits in only a limited way. Speaking gener-
ally, a bank is a moneyed institution to facilitate the
borrowing, lending and caring for money. But whether

technically banks, or not; these organizations may serve the governmental purposes declared by Congress in their creation. Furthermore, these institutions are organized to serve as a market for United States bonds. Not less than 5% of the capital of the Federal Land Banks, for which stock is outstanding to Farm Loan Associations, is required to be invested in United States bonds. Both kinds of banks are empowered to buy and sell United States bonds.

In *First National Bank* v. *Union Trust Co., supra,* this court sustained the power of Congress to enable a national bank to transact business, which, by itself considered, might be beyond the power of Congress to authorize. In that case it was held to be within the authority of Congress to permit national banks to exercise, by permission of the Federal Reserve Board, when not in contravention of local law, the office of trustee, executor, administrator or registrar of stocks or bonds.

We, therefore, conclude that the creation of these banks, and the grant of authority to them to act for the Government as depositaries of public moneys and purchasers of Government bonds, brings them within the creative power of Congress although they may be intended, in connection with other privileges and duties, to facilitate the making of loans upon farm security at low rates of interest. This does not destroy the validity of these enactments any more than the general banking powers destroyed the authority of Congress to create the United States Bank, or the authority given to national banks to carry on additional activities, destroyed the authority of Congress to create those institutions.

In the brief filed upon reargument counsel for the appellant seem to admit the power of Congress to appropriate money for the direct purposes named, and in that brief they say: "Tax exemption is the real issue sought to be settled here." Deciding, as we do, that these institu-

tions have been created by Congress within the exercise of its legitimate authority, we think the power to make the securities here involved tax exempt necessarily follows. This principle was settled in *McCulloch* v. *Maryland,* and *Osborn* v. *Bank, supra.*

That the Federal Government can, if it sees fit to do so, exempt such securities from taxation, seems obvious upon the clearest principles. But, it is said to be an invasion of state authority to extend the tax exemption so as to restrain the power of the State. Of a similar contention made in *McCulloch* v. *Maryland,* Chief Justice Marshall uttered his often quoted statement: "That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control, are propositions not to be denied." 4 Wheat. 431.

The same principle has been recognized in the National Bank Cases declaring the power of the States to tax the property and franchises of national banks only to the extent authorized by the laws of Congress. *Owensboro National Bank* v. *Owensboro,* 173 U. S. 664, involved the validity of a franchise tax in Kentucky on national banks. In that case this court declared (pp. 668, 669) that the States were wholly without power to levy any tax directly or indirectly upon national banks, their property, assets or franchises, except so far as the permissive legislation of Congress allowed such taxation; and the court declared that the right granted to tax the real estate of such banks, and the shares in the names of the shareholders, constituted the extent of the permission given by Congress, and any tax beyond these was declared to be void.

In *Farmers & Mechanics Savings Bank* v. *Minnesota*, 232 U. S. 516, this court held that a State may not tax bonds issued by the municipality of a territory; that to tax such bonds as property in the hands of the holder is, in the last analysis, an imposition upon the right of a municipality to issue them.

The exercise of such taxing power by the States might be so used as to hamper and destroy the exercise of authority conferred by Congress, and this justifies the exemption. If the States can tax these bonds they may destroy the means provided for obtaining the necessary funds for the future operation of the banks. With the wisdom and policy of this legislation we have nothing to do. Ours is only the function of ascertaining whether Congress in the creation of the banks, and in exempting these securities from taxation, federal and state, has acted within the limits of its constitutional authority. For the reasons stated, we think the contention of the Government, and of the appellees, that these banks are constitutionally organized and the securities here involved legally exempted from taxation, must be sustained.

It follows that the decree of the District Court is

*Affirmed.*

MR. JUSTICE BRANDEIS took no part in the consideration or decision of this case.

MR. JUSTICE HOLMES, dissenting.

No doubt it is desirable that the question raised in this case should be set at rest, but that can be done by the Courts of the United States only within the limits of the jurisdiction conferred upon them by the Constitution and the laws of the United States. As this suit was brought by a citizen of Missouri against a Missouri corporation the

single ground upon which the jurisdiction of the District Court can be maintained is that the suit "arises under the Constitution or laws of the United States" within the meaning of § 24 of the Judicial Code. I am of opinion that this case does not arise in that way and therefore that the bill should have been dismissed.

It is evident that the cause of action arises not under any law of the United States but wholly under Missouri law. The defendant is a Missouri corporation and the right claimed is that of a stockholder to prevent the directors from doing an act, that is, making an investment, alleged to be contrary to their duty. But the scope of their duty depends upon the charter of their corporation and other laws of Missouri. If those laws had authorized the investment in terms the plaintiff would have had no case, and this seems to me to make manifest what I am unable to deem even debatable, that, as I have said, the cause of action arises wholly under Missouri law. If the Missouri law authorizes or forbids the investment according to the determination of this Court upon a point under the Constitution or acts of Congress, still that point is material only because the Missouri law saw fit to make it so. The whole foundation of the duty is Missouri law, which at its sole will incorporated the other law as it might incorporate a document. The other law or document depends for its relevance and effect not on its own force but upon the law that took it up, so I repeat once more the cause of action arises wholly from the law of the State.

But it seems to me that a suit cannot be said to arise under any other law than that which creates the cause of action. It may be enough that the law relied upon creates a part of the cause of action although not the whole, as held in *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 819–823, which perhaps is all that is meant by the less guarded expressions in *Cohens* v. *Virginia*, 6 Wheat. 264, 379. I am content to assume this to be so, although the *Osborn Case*

has been criticized and regretted. But the law must create at least a part of the cause of action by its own force, for it is the suit, not a question in the suit, that must arise under the law of the United States. The mere adoption by a state law of a United States law as a criterion or test, when the law of the United States has no force *proprio vigore,* does not cause a case under the state law to be also a case under the law of the United States, and so it has been decided by this Court again and again. *Miller v. Swann,* 150 U. S. 132, 136, 137; *Louisville & Nashville R. R. Co v. Western Union Telegraph Co.,* 237 U. S. 300, 303. See also *Shoshone Mining Co.* v. *Rutter,* 177 U. S. 505, 508, 509.

I find nothing contrary to my views in *Brushaber* v. *Union Pacific R. R. Co.,* 240 U. S. 1, 10. It seems to me plain that the objection that I am considering was not before the mind of the Court or the subject of any of its observations, if open. I am confirmed in my view of that case by the fact that in the next volume of reports is a decision, reached not without discussion and with but a single dissent, that "a suit arises under the law that creates the cause of action." That was the *ratio decidendi* of *American Well Works Co.* v. *Layne & Bowler Co.,* 241 U. S. 257, 260. I know of no decisions to the contrary and see no reason for overruling it now.

MR. JUSTICE McREYNOLDS concurs in this dissent. In view of our opinion that this Court has no jurisdiction we express no judgment on the merits.