BLOUNT v. FARMERS' BANK OF GREENVILLE, N. C., et al.

In re WINGATE.

(District Court, E. D. North Carolina, Raleigh Division. February 12, 1924.)

No. 456.

1. **Assignments** ⬯52—Loan made on agreement to pay from certain fund held to effect an equitable assignment.

A bank lent money on a specific agreement that it should be repaid from the proceeds of a real estate loan then being negotiated by the borrower, which by agreement with the proposed real estate lender was to be remitted to the bank for that purpose. But for such agreement the bank would not have lent the money. *Held*, that the transaction effected an equitable assignment pro tanto of the fund arising from the real estate loan, if and when realized.

2. **Assignments** ⬯48—Equitable assignment may be made verbally.

No particular form of words is necessary to effect an equitable assignment, nor is a written instrument required; the essential fact being an intent to transfer the fund beyond recall by the assignor.

3. **Assignments** ⬯48—Equitable assignment of potential fund not effective, unless fund comes into existence.

To render effective an equitable assignment of a potential fund, to be realized from an expected source, the fund must actually come into existence.

4. **Subrogation** ⬯33(2)—Is merely substitution to rights of another creditor.

One can acquire by subrogation no greater rights than those of the party to whose interest he is subrogated.

5. **Subrogation** ⬯36—Assignment of mortgage, not enforceable by assignor, held to give no rights by subrogation.

A bank lent money on an agreement that it should be repaid from the proceeds of a real estate loan then being negotiated by the borrower.

---

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Notes and a mortgage were executed for the real estate loan, and the mortgage recorded, but the loan was not consummated, and the notes and mortgage therefore were unenforceable for want of consideration. *Held,* that their assignment to the bank, though with consent of the mortgagor, gave the bank no lien by subrogation as against an intervening mortgagee.

In Equity. Suit by M. K. Blount, trustee in bankruptcy of Richard W. Wingate, against the Farmers' Bank of Greenville, N. C., in which Smythe Bros. and McLeary & McClelland Company, trading as the Southern Stockyards Corporation, intervened. On distribution of fund arising from sale of real estate.

Skinner & Whedbee, of Greenville, N. C., for plaintiff.

Small, MacLean & Rodman, of Washington, N. C., and Albion Dunn, of Greenville, N. C., for Farmers' Bank of Greenville.

Lewis G. Cooper, of Greenville, N. C., for Southern Stockyards Corporation.

CONNOR, District Judge. The bill, answers, plea of intervention, and evidence disclose the following facts:

R. W. Wingate, of Ayden, N. C., at some time during the month of September, 1919, applied to the cashier of the Farmers' Bank of Greenville, N. C., for a loan of money. At that time Wingate was engaged in buying and selling horses and mules, maintaining for that purpose a sale stable. The bank had theretofore made several loans to him, for the security of which he had deposited notes and chattel mortgages on horses and mules. The bank, in connection with its other banking business, was representing the Virginia-Carolina Joint-Stock Land Bank, of Norfolk, Va., receiving applications for loans secured by mortgages upon real estate in Pitt county. Mr. Clodfelter, cashier, stated to Wingate that the loan which he desired was for a larger amount than the bank was in a position to make, and that, in view of his financial condition, he would require a longer credit than the bank could extend. He suggested that Wingate negotiate a loan from the Virginia-Carolina Joint-Stock Land Bank, of Norfolk, Va., for an amount sufficient to retire certain mortgages, then outstanding, on his land, and give him a surplus to meet his business needs, to which Wingate assented; Clodfelter proposing that he would aid him in negotiating the loan. A short time after this conversation, the secretary of the Land Bank, at Norfolk, Va., came to Greenville, saw Wingate and Clodfelter together, and the necessary steps were taken looking to securing the loan.

On September 19, 1917, application, upon blanks furnished by the Land Bank, was filled up, signed by Wingate, and delivered to the secretary or other appropriate officer or agent of the Land Bank. The application was introduced and a copy thereof filed herein. The amount of the loan applied for by Wingate was fixed at $37,500. The application contained a list of the tracts of land and the estimated value thereof, proposed to be conveyed by way of security for the proposed loan, together with a list of the incumbrances, mortgages, etc., thereon, represented to be $13,000. An appraisal of the land was made by the representatives of the Land Bank, and upon their report the

executive committee of the Land Bank, on December 29, 1919, filed their report recommending that the bank make the loan.

The attorney for the Land Bank made an abstract of the title to the land, with a statement that the incumbrances thereon were $13,000. On April 1, 1920, Richard Wingate and his wife executed and delivered to the Land Bank their promissory note for $37,500, payable in 40 semiannual installments, including interest, of $1,622.25 each, and at the same time executed and delivered to the Guaranty Title & Trust Corporation a mortgage to secure the payment of said note, conveying the land described in the application, being a portion of the Gum Swamp tracts, which was admitted to probate and recorded in the office of the register of deeds of Pitt county, N. C., April 12, 1920, in Book Q 13, p. 411.

P. L. Clodfelter, cashier of the Farmers' Bank of Greenville, testified that several days after the suggestion was made by him to Wingate to apply for the loan, and "while the application was in process, and after Wingate had agreed to borrow the money from the Land Bank, he, as cashier for the Farmers' Bank, loaned Wingate $8,000, for which Wingate executed his note to the bank. It was agreed between Wingate and wife and himself that, if he would advance this $8,000, they would cause the money loaned by the said bank to be put in his hands for this loan, so that he (Clodfelter) could get this particular money first. Witness was assured by F. W. McKinney, secretary of the Land Bank, that the loan would go through. Witness would not have made the advance of $8,000, except for the fact that this application was being made and the assurance that it would go through.

Before the executive committee of the Land Bank approved the loan, witness told them of this transaction. After McKinney told witness that the loan would go through, he advanced Wingate, November, 1919, $10,000, in addition to the loan of $8,000. This amount was loaned upon the agreement that the money was to be paid out of this particular loan from the Virginia-Carolina Joint-Stock Land Bank. This agreement was made between Mr. Clark, attorney for the Land Bank, Mr. McKinney, and the Land Bank, on one side, and Richard Wingate, on the other. The money was to be deposited in the Farmers' Bank, so that witness could get his money out of this loan. Wingate testified that it was his understanding with Clodfelter that from the proceeds of the loan, which he expected to receive from the Land Bank, the prior mortgages on the land were to be paid off first, and then the loans made by the Farmers' Bank were to be paid; that the money, proceeds of the loan, was to be sent by the Land Bank to the Farmers' Bank for that purpose. This is corroborated by McKinney and Clark. It was clearly understood by and between all of the parties that, when the loan was made by the Land Bank, the money was to be sent to the Farmers' Bank of Greenville, and the mortgages on the land paid and canceled, under the supervision of Mr. Clark, attorney for the Land Bank, and the notes for amounts advanced by the Farmers' Bank for $8,000 and $10,000 were to be paid from the proceeds of the loan. Mr. McKinney thus describes the process by which the loans were secured from the Land Bank:

"Applications are received from the landowners and farmers, and the next step is to forward these to the federal farm loan appraisers, for the government, to arrange about the bonding. If this report is given and acceptable to applicant, the recommendation is given to the Land Bank and handled by the finance committee, to recommend or approve. The machinery provides that, before this Federal Farm Loan Bank may realize out of this collateral, the bonds are to be issued by the bank and certified to the district of the government. The application must be approved by the so-called board of Federal Land Bank; but we can approve it, and not wait for that, as, for instance, in this Richard Wingate loan, for the purpose of facilitating the loan, we had notes prepared for our own protection. When a mortgage has been finally approved by the Farm Loan Bureau in Washington. in amount of say $50,000, they may be forwarded to district Farm Land Banks. It would return the bond to us for our treasury, and thus the business can automatically be carried and secured."

There was delay in perfecting the arrangement for completing the loan and securing the money, occasioned to some extent by the litigation pending in the federal court, involving the validity of the federal Land Bank Act of July 17, 1916 (Comp. St. § 9835a, et seq.), resulting, February 28, 1921, in the decision of the case of Smith v. Kansas City Title & Trust Co., 255 U. S. 180, 41 Sup. Ct. 243, 65 L. Ed. 577. During this time the value of lands in eastern North Carolina depreciated very heavily, occasioning doubt, whether, when the litigation came to an end, the Land Bank would make the loan. Wingate renewed his notes to the Farmers' Bank, under the same agreement, as to the application of the money expected from the loan, made at and before the loans were made. On December 24, 1920, Mr. W. A. Dunn, attorney for the Farmers' Bank wrote Mr. McKinney as follows:

"Dear Sir: The Farmers' Bank of this city has requested me to write you with respect to note of $37,500, executed by Mr. R. Wingate, of Ayden, Pitt county, N. C., to your bank. Mr. Clodfelter, cashier of Farmers' Bank, advises me that Mr. Wingate borrowed from said bank, for himself and his firm (R. Wingate & Son), sums aggregating $18,000, with the express understanding that said amounts were to be repaid out of loan which Mr. Wingate expected to secure from your bank, and on account of which he executed the note of $37,500 above referred to, secured by mortgage upon real estate in the county, with the further understanding that if, for any cause, the loan was not consummated, the note would be transferred to the Farmers' Bank, as additional and cumulative security to that given by Wingate to the bank at the time the loan of $18,000 was made.

"As I am advised, the loan from your bank was never consummated, although the note and mortgage from Wingate and wife to you, or the bank, was duly executed, and that the note is now in possession of your attorney, D. M. Clark, Esq., of Greenville, and the mortgage or trust remains uncanceled of record. Under the above circumstances, the Farmers' Bank is requesting that the note of $37,500 be transferred to it, as additional and cumulative security and I have advised Mr. Clodfelter that, under the circumstances surrounding the loan of his bank to Wingate, he is clearly entitled to be subrogated to the lien of the mortgage which you hold, in which view I have no doubt that you will agree.

"The Farmers' Bank is therefore insisting that the trust securing the note of $37,500 remain intact, and continue a valid and subsisting lien upon the property secured thereby, and I presume there will be no effort on your part to have the paper canceled, but, on the contrary, will co-operate with the Farmers' Bank to the extent that it may secure to itself the security of your mortgage. Thanking you to advise me promptly your position in the premises, I beg to remain yours very truly."

On December 28, 1920, Mr. Dunn wrote Mr. McKinney as follows:

"Dear Sir: Following up my favor to you of December 24th, in the matter of the R. Wingate note and trust, I beg to state that Mr. Wingate has confirmed the statement of the Farmers' Bank, and has to-day executed power of attorney to you, directing transfer of the note of $37,500 by you to the Farmers' Bank, and I herewith hand you the power. With this authority, I take it you will have no hesitancy in making the transfer, and will thank you to instruct Mr. D. M. Clark, who I understand has the papers, to return them to you, that the transfer may be made without any unnecessary delay. Awaiting your reply, I beg to remain yours truly."

Mr. Dunn inclosed the power of attorney referred to in his letter in the following words, to wit:

"To F. W. McKinney, Esq., Secretary of Virginia-Carolina Joint-Stock Land Bank Company, Norfolk, Va.:

"Whereas I, R. Wingate, individually, have heretofore borrowed of the Farmers' Bank of Greenville, N. C., the sum of $10,000, and have further borrowed of said bank in behalf of the firm of R. Wingate & Son the sum of $8,000; and whereas, it was expressly understood, agreed, and stipulated, at the time, that the money so borrowed was to be repaid out of a loan then being negotiated from the Virginia-Carolina Joint-Stock Land Bank Company in the sum of $37,500, and I, the said R. Wingate, promising at said time that, if for any cause I should fail to receive the amount of said loan from said bank, I would cause said bank to transfer the note executed to it to the Farmers' Bank of Greenville, N. C., as additional and collateral security to that given said Farmers' Bank at the time of said loan by it to me; and whereas, the said Joint-Stock Lank Bank Company has not advanced the amount of said note, and by reason thereof I have been unable to pay the note held by the Farmers' Bank against me; and whereas, I desire to effect the agreement had with the Farmers' Bank as aforesaid, and give to it the said additional and cumulative security: I, the said R. Wingate, do now, by these presents, direct you, the secretary of said Joint-Stock Land Bank Company, or such other officer of said company as may be authorized by law to make said transfer, to indorse, transfer, and deliver the note in the sum of $37,500 to the Farmers' Bank of Greenville, N. C., to be held by it as additional and cumulative security to the loan of $18,000, fully above referred to, and do such other things as you may deem proper in connection therewith to secure a proper transfer of said note and trust.

"Witness my hand and seal this the 28th of December, 1920.
"[Signed] R. Wingate. [Seal.]"

This paper was acknowledged before A. L. Blow, Jr., notary public. On January 3, 1921, F. W. McKinney, secretary, wrote the following letter, from Norfolk, Va.:

"Federal Farm Loan Board, Washington, D. C.—Gentlemen: The above is the case that has remained 'in the mill,' with the hope that it would be 'ground out' and loan duly made, in accordance with the application and the report of the federal appraiser, it already having been approved by him, as well as by our finance committee. It appears that the Farmers' Bank of Greenville, N. C., made advances approximately of $20,000, in anticipation of the proper closing of this loan and the repayment to them of the amount which they advanced in due course. This referred-to bank, through their attorney and an officer of the bank, have lodged with us a proper request with power of attorney, to assign to them the mortgage from Wingate to this bank, which has been duly recorded. Having in mind a ruling from your office that it would not be proper to assign and sell mortgages which we took for the specific purpose of having them deposited in due course for bonds, we now address you for instructions namely: Is it proper for us to assign the referred-to mortgage to the Farmers' Bank of Greenville? It would seem that they are entitled to the security, at least pending a decision from the Supreme Court whether we are to go on or not. For your information, we are informed that

other transactions between Wingate and others have been placed of record, hence the mortgage made to us was filed; otherwise, it would be a more simple way to have the papers canceled and a new mortgage made to the Farmers' Bank. Thanking you for your reply, etc.

"Copy to Farmers' Bank, Greenville, N. C."

Mr. McKinney says that the delay in making the loan was caused by litigation involving the constitutionality of the Federal Land Bank Act; that the loan was never authorized by the Farm Loan Bureau for the bonds. There was no ruling to prevent the Land Bank from making this loan on their own account, "but we could not have deposited the note and gotten the bonds on it." Smith v. Kansas City Title Co., supra.

On February 8, 1922, the Land Bank executed and delivered to the Farmers' Bank of Greenville a paper writing in the following words, to wit:

"This indenture, made on this the 8th day of February, 1922, witnesseth: that the Virginia-Carolina Joint-Stock Land Bank, a corporation, with principal office in Norfolk, in state of Virginia, party of the first part, and the Farmers' Bank of Greenville, party of the second part, witnesseth: That whereas, on the 1st day of April, 1920, R. Wingate and wife executed and delivered to the Virginia-Carolina Joint-Stock Land Bank their note for $37,500, pursuant to the terms and provisions of the Federal Farm Loan Act, which said note was duly secured by that deed of trust from R. Wingate and wife to the Guaranty Title & Trust Corporation, appearing of record in the register's office for Pitt county, N. C., in Book Q 13, at page 411; and whereas, in anticipation of said loan, the said R. Wingate borrowed from the Farmers' Bank of Greenville, N. C., $18,000, promising and agreeing that the said amount should be repaid to the said bank out of the loan from the Virginia-Carolina Joint-Stock Land Bank, agreeing at said time, in the event that he should fail to receive the amount of said loan from said bank, that he would cause said Land Bank to transfer the said note aforesaid to the Farmers' Bank of Greenville, N. C.; and whereas, the said Joint-Stock Land Bank has not paid over to the said R. Wingate the amount aforesaid, and by reason thereof the said R. Wingate has been unable to pay his indebtedness to the Farmers' Bank at Greenville; and whereas, the said R. Wingate has requested the said Joint-Stock Land Bank to transfer said note to said bank, the said Joint-Stock Land Bank now desires to comply with said request:

"Now, therefore, in consideration of the premises and of the sum of $5 in hand paid, the receipt whereof is hereby acknowledged, the said Virginia-Carolina Joint-Stock Land Bank has sold, assigned, and set over, and by these presents does hereby sell, assign, transfer, and set over, unto the Farmers' Bank of Greenville, N. C., its successors and assigns, any right, title, and interest which the said Virginia-Carolina Joint-Stock Land Bank may have in and to that certain promissory note, dated April 1, 1920, made by Richard Wingate and Mary J. Wingate to the order of the Virginia-Carolina Joint-Stock Land Bank, for $37,500, with interest at 6 per cent. per annum, payable in forty semiannual payments, which said note is described in the deed of trust executed by R. Wingate and wife to the Guaranty Title & Trust Corporation, and appearing of record in the register's office for Pitt county, N. C., in Book Q 13, page 411, with the money due and to grow due thereon.

"In testimony whereof, said Virginia-Carolina Joint-Stock Land Bank has caused these presents to be signed in its corporate name by its president, and its common seal to be affixed and attested by its secretary, this the day of date first above written.

"[Signed]              Virginia-Carolina Joint-Stock Land Bank.

                                        "By A. P. Grice, President.

"Attest: F. W. McKinney, Secretary.    [Seal.]"

This paper writing was duly acknowledged and recorded in the office of the register of deeds of Pitt county February 12, 1922. At

the time of the execution and delivery of said paper writing, the note therein described was delivered to the Farmers' Bank of Greenville, and there was indorsed thereon the following words:

"Any interest which the Virginia-Carolina Joint-Stock Land Bank of Norfolk has in this note is hereby assigned to the Farmers' Bank of Greenville, N. C., as requested by Richard Wingate, without recourse to us. Virginia-Carolina Joint-Stock Land Bank, by J. A. Goodwin, Treasurer."

Under said indorsement were the following words:

"This note reduced to the sum of $18,000. The Farmers' Bank, P. L. Clodfelter, Cashier."

The land conveyed by the mortgage executed by Wingate and wife to the Guaranty Title & Trust Company is described as:

"Two certain tracts of land located on the Gum Swamp Canal and situate in the Swift Creek township, Pitt county, state of North Carolina, near the town of Ayden,"

—followed by a specific description by metes and bounds; one tract contained 352.1, and the other 187.5, acres. It seems that these tracts were parts of larger tracts owned by Wingate. In the application he stated that it was his—

"purpose and intention that the proceeds of the loan is to be invested in the following manner: Pay off present incumbrances, drainage, buildings, and general improvements."

The incumbrances are specifically set out as three mortgages to secure debts aggregating $13,000. On December 4, 1920, Wingate and wife executed a mortgage, or deed of trust, to F. G. James, trustee, on the lands included in the mortgage executed to the Land Bank and other lands to secure the payment of two notes of same date, one for $26,000, due January 1, 1922, and one for $25,000, due January 1, 1923, payable to Smythe Bros., etc., recorded in Pitt county December 4, 1920.

Richard Wingate and Wingate & Son continued their sales stables and farming operations during the years 1920 and 1921. On March 2, 1922, said Richard Wingate was adjudged bankrupt, and M. K. Blount was duly elected trustee. On the 27th day of July, 1922, by direction of the bankruptcy court, the trustee brought a suit in equity against the Farmers' Bank and a number of other persons for the purpose of ascertaining the incumbrances on the land included in the "Gum Swamp tracts," and the amounts due thereon, priorities, etc., and praying that the said land be sold by commissioners appointed by the court, and the proceeds thereof administered by the court according to the respective rights of the mortgagees and other creditors. All persons having liens or claims against the property were made parties or intervened. A decree was passed in accordance with the facts disclosed by the pleadings and proof and the prayer of the bill. M. K. Blount and J. R. Turnage were appointed commissioners and directed to sell the lands of Richard Wingate, included in the Gum Swamp Land, for cash and report to the court the amounts bid, the amounts, order of priority, and all other pertinent facts in regard to the title and the incumbrances on the land.

Upon their report the sales of the lands were, after notice to all parties having any interest therein, confirmed, and the amounts realized therefrom paid into the court. It appeared from such report that all of the Gum Swamp land sold for $49,500; that the debts secured by mortgages and trust deeds thereon aggregated $33,619.23, having priority over the mortgage to the Land Bank and to F. G. James, trustee for Smythe Bros. This did not include the taxes and costs incurred in making the sales. Decree in M. K. Blount, Trustee, v. F. G. James, Trustee, on February 20, 1923, No. 455 Eq. It was found, upon the hearing upon the report, all parties being either, present or represented by counsel, that, after paying the debts secured by mortgages prior in date and lien to the Land Bank mortgage and mortgage to F. G. James, taxes, and the costs, there remained in the possession of the court, from the proceeds of the sale of the Gum Swamp-lands, the sum of approximately $14,000, all of which will appear by reference to the decree in said cause. Equity Docket, Raleigh Division, No. 455.

The Southern Stockyards Company, the owner of the notes executed to Smythe Bros. and McCleary & McClelland Company, secured by mortgage to F. G. James, intervened, and claimed that the amount in-the possession of the court should be applied to the payment of these notes; that the mortgage executed by Wingate to F. G. James, for their security, was next in order of priority after the discharge of the debts secured by prior mortgages, other than the mortgage to the Guaranty Title & Trust Company. This claim was resisted by the Farmers' Bank of Greenville, contending that it is entitled to the balance of the proceeds of the sale of the Gum Swamp lands, either by subrogation to the rights of the Land Bank, or by the assignment of the notes and mortgage to the Farmers' Bank, in accordance with the direction, December 28, 1920, by Wingate to the Land Bank, to assign the note and mortgage to said Farmers' Bank. Mr. Wingate says:

"I was doing business with the Smythe people in Richmond, and I saw I was not going to make these payments I was due them, and I asked them if I couldn't put up some paper. Before they made me an answer, they called a committee of all the stockyard people together, and they agreed to help me to do business if I fixed them all right. I also told them about the loan, and I had been doing business with them, and in fact they had been taking care of me, they and Mr. Clodfelter. Mr. James drew the Smythe papers, and me and my wife signed them. My son and I had gotten money from Mr. Clodfelter, and we intended to pay him as soon as we got the loan from the Land Bank."

### Mr. MacLean, representing the Farmers' Bank, asked Wingate:

"Did you turn this $8,000 and $10,000, that the Farmers' Bank loaned you, over to Smythe Bros.? A. Some was bound to have gone to them, as I sent them checks every week, I think. Mr. Clodfelter told me to do the best I could; he was going to try to get me that loan. * * * I told them [Smythe Bros.] about the loan, and I told them about all the mortgages outstanding against the farm. I told them what was outstanding against the farms, and I think I told them about the application, and about what I had told him [Mr. Clodfelter] about the $18,000 that the Farmers' Bank had advanced to me on the loan. Mr. Jim Smythe can remember it better than I can. He is here now."

The Gum Swamp lands were sold without regard to the lines separating that portion included in the mortgage to Guaranty Title & Trust

Company from the other lands belonging to Wingate, upon which other and prior mortgages existed. It appearing upon the hearing, and being conceded by counsel for all parties concerned in the proceeds of the sale, that it was impracticable to separate or ascertain the amount of the proceeds of the sales of the several tracts of land covered by mortgages, on a basis of the amounts for which separate portions of the land were sold, an agreement was made and entered of record, on the hearing, that for the purpose of dealing with the proceeds of the sale of all of the said land and administering the claims of the several mortgagees and claimants of the fund constituting the proceeds of the sale of said lands, all of the mortgages should be regarded and treated by the court as covering the entire tract, and the proceeds of the sale regarded and treated as representing all of the lands sold by the commissioners under the decree of the court herein. The balance of the proceeds of the sale of the lands under the control of the court, after discharging all of the incumbrances prior to the mortgage to the Title & Guaranty Company and the mortgage to F. G. James, trustee, executed by Wingate as security for the debt of Smythe Bros., taxes, and costs is provided for by the bond of the purchasers, subject to the final decree herein. See Report of Commissioners and decree in No. 455 Equity, Clerk's Office, Raleigh, N. C.

Counsel for the Farmers' Bank of Greenville base their claim to the relief demanded in the plea of intervention upon two propositions, upon either of which, if sustained, they contend that their client is entitled to work out its equitable rights: (1) That the transaction between Wingate and Clodfelter, cashier of the bank, constituted and operated as an equitable assignment of so much of the amount to be borrowed by Wingate from the Bank as was necessary to pay the loans made by the Farmers' Bank to Wingate, aggregating $18,000, represented by Wingate's notes payable to the Farmers' Bank. That notice was given to, and accepted by, the representatives of the Land Bank of such assignment, and agreed upon the method by which it was to be executed. (2) That the Farmers' Bank is, in equity, subrogated to the rights of the Land Bank to the extent of the amount loaned to Wingate. That this right to subrogation entitled the Farmers' Bank, upon the failure of the Land Bank to make the loan it had promised to Wingate, to call for an assignment of the note and mortgage executed for the purpose of securing such loan, when made. That an assignment of such note and mortgage having thereafter been made by the Land Bank, by Wingate's direction, it has as complete, perfect, equitable lien upon the property conveyed by way of mortgage to the Title Guaranty Company, as the Land Bank would have had if the loan had been made; that is, that it stands, in respect to its security for the payment of the notes for $18,000, in the shoes of the Land Bank.

[1] The question, therefore, to be disposed of, is whether the transaction between Wingate and Clodfelter, cashier, constitutes an equitable assignment of so much of the amount promised to be loaned to Wingate, $37,500, as was necessary to pay the amount loaned by the Farmers' Bank to Wingate. Other questions of subordinate character will arise, dependent upon the conclusion reached to the primary

questions. That an assignment, based upon valuable consideration, and not coming within any of the exceptions to the general principle, may be made, and enforced by courts of equity, of choses in action, possibilities, expectancies, things not in esse, and mere contingencies, is settled by decisions of courts of equity and authoritative text-writers. Bispham, Eq. (10th Ed.) § 164, and notes; 3 Pomeroy's Eq. (3d Ed.) 1270 et seq. It is equally well settled that a draft, or check, drawn upon a deposit in bank, or debt due the drawee, for a part of such deposit or debt, or even the entire amount, in the absence of any circumstances regarded by a court of equity as clearly indicating a purpose to assign such fund, will not be treated as an equitable assignment. In Fourth Street Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855, Mr. Justice White, in an able and exhaustive discussion of the subject, says:

"It is * * * settled that a check, drawn in the ordinary form, does not, as between the maker and payee, constitute an equitable assignment pro tanto of an indebtedness owing by the bank upon which the check has been drawn, and that the mere giving and receipt of the check does not entitle the holder to priority over general creditors in a fund received from such bank by an assignee under a general assignment made by the debtor for the benefit of his creditors."

The learned justice further says:

"That the owner of a chose in action, or of property in the custody of another, may assign a part of such rights, and that an assignment of this nature, if made, will be enforced in equity, is also settled doctrine of this court. * * * Whilst an equitable assignment or lien will not arise against a deposit account solely by reason of a check drawn against the same, yet the authorities establish that if, in the transaction connected with the delivery of the check, it was the understanding and agreement of the parties that an advance about to be made should be a charge on and be satisfied out of a specified fund, a court of equity will lend its aid to carry such agreement into effect as against the drawer of the check, mere volunteers, and parties charged with notice."

Following a discussion of the facts in the instant case, he says:

"The deduction arises that, as it cannot be reasonably conceived that the loan would have been made without the reference to and assignment of the particular fund from which alone the hope of immediate payment was to be reasonably expected, the parties must have and did intend to create a particular appropriation, charge, or lien on the property upon the faith of which they both dealt. The transaction, therefore, was a proposition to borrow, on the one hand, accompanied with the disclosure that security was necessary and tendering the security, and, on the other hand, an acceptance of such proposal and an advance made on the faith of it. Not to conclude that such was the agreement and contract contemplated and actually entered into by the parties would lead to the impossible and contradictory theory that the minds of the parties could not and would not have met on the subject of the loan unless a prerequisite link to that meeting of minds existed, and yet at the same time to hold that the minds had met without the existence of that prerequisite which was the very essence and necessary foundation of the agreement."

In that case the president of one bank applied to the president of another bank for an advance of $25,000, of which the first bank stood in immediate need, stating that the bank had, in a third bank, a deposit in excess of the amount desired, upon which he proposed to give a check. Relying upon such statement, and a memorandum showing

that the bank had the deposit, as stated, the advance was made. The check was presented to the drawee bank, when payment was refused. At the time the check was presented the drawer bank had to its credit an amount sufficient to pay it, which was afterwards paid to Yardley, assignee in insolvency of the drawee bank. The court held that the transaction operated as an equitable assignment of the fund on deposit to the credit of the drawer bank and that plaintiff drawee bank was entitled to recover the amount from defendant assignee in insolvent proceedings.

[2] Tested by the authority of this case and cases. cited, it would seem clear that the transaction as stated by Wingate and Clodfelter, cashier, knowledge of which was conveyed to the representatives of the Land Bank, constituted an equitable assignment of the funds, when loaned by said bank to Wingate, and that if the loan had been made as contemplated by the parties to the transaction, the Farmers' Bank would have been entitled to demand that the Land Bank remit the amount loaned to Wingate which, after payment of prior liens on the property, would be applied to the discharge of the loans made by the Farmers' Bank to Wingate.

"No particular form of words is necessary in order to make a valid assignment of a chose in action. Nor is any written instrument required, for it is sufficient if there is a verbal declaration whereby the intention to part with the ownership of the chose is properly manifested." Bispham, Equity (10th Ed.) 167.

The learned author says, however, that:

"The better opinion would seem to be that a mere promise to pay out of a fund will not operate as an equitable assignment of such fund, * * * but there has been some fluctuation of opinion as to the correctness of this opinion, although the more recent decisions in the United States decidedly support it."

After noting several English cases holding that a promise to pay a debt out of specified fund would effect an equitable assignment, he says:

"In the United States, however, the weight of opinion is the other way."

He cites, among other decided cases, Christmas v. Russell, 14 Wall. 69, 20 L. Ed. 762, in which Mr. Justice Swayne says:

"An agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment; a covenant in the most solemn form has no greater effect. The phraseology employed is not material, provided the intent to transfer is manifested. Such an intent and its execution are indispensable. The assignor must not retain any control over the fund, any authority to collect, or any power of revocation. If he do, it is fatal to the claim of the assignee. The transfer must be of such a character that the fundholder can safely pay, and is compellable to do so, though forbidden by the assignor. Where the transfer is of the character described, the fundholder is bound from the time of notice. * * * But an order to pay out of a specified fund has always been held to be a valid assignment in equity and to fulfill all the requirements of the law."

Mr. Bispham says that, while an equitable assignment will not be effected by simply giving a check on a fund, "yet the authorities establish that if, in the transaction connected with the delivery of the check, it was the understanding and agreement of the parties that the

advance about to be made should be a charge on and satisfied out of a specified fund, a court of equity will lend its aid to carry such agreement into effect as against the drawer of the check, volunteers, and parties charged with notice." For this conclusion he cites the Yardley and many other cases.

Prof. Pomeroy, with his usual industry, discusses the doctrine in its various aspects, and in the notes to the third edition gives an exhaustive list of more or less conflicting decided cases, which it is not practicable to attempt to discuss. There appears to be some divergence of opinion between the English and American courts. 3 Pom. Eq. § 1270 et seq. Prof. Pomeroy (section 1280, note 3) cites the opinion of Rapallo, J., in Brill v. Tuttle, 81 N. Y. 454, 37 Am. Rep. 515, as containing "clearly and accurately the doctrine, in its full scope, with its principal limitations."

"The equitable doctrine, with respect to the assignment of property to be acquired in future, is extended to this species of equitable transfer. The fund need not be actually in being; if it exists potentially—that is, if it will in due course of things arise from a contract or arrangement already made or entered into when the order is given—the order will operate as an equitable assignment of the fund, as soon as it is acquired, and will create an interest in it which a court of equity will enforce." 3 Pomeroy, Eq. § 1283.

While the cases cited in the note appear to sustain the text, with more or less variation, it is said that "they were placed upon special circumstances." In Mack Mfg. Co. v. Smoot, 102 Va. 724, 47 S. E. 859, it is held that:

"An order from a person to whom money is due, or to become due, on the person in whose hands or under whose control it may be, to pay to the payee, constitutes an equitable assignment."

The opinion of Cardwell, J., is sustained by a number of cases cited. Watson v. Brunner, 128 Va. 600, 105 S. E. 97. If the loan had been made to Wingate, it would seem clear that its representatives would have been compelled by a court of equity to pay the money, or certainly so much of it as was necessary to discharge the notes executed by him for the loan made by the Farmers' Bank, to the bank, and upon its failure to do so would have been liable to an action therefor by the Farmers' Bank.

This condition, however, never existed. The loan was not made by the Land Bank. The Land Bank never held any fund under its control, or which Wingate could have called for, subject to the assignment. The negotiation between Wingate and the Land Bank was never consummated. Whether the Land Bank, by what occurred in the dealings with Wingate, came under a legal enforceable obligation to make the loan of $37,500 is not involved in this case. No such claim is, or could be, asserted or enforced in this litigation, to which the Land Bank is not, nor can be, made a party.

[3] While it is true that, by the modern decisions of courts of equity, the assignee acquires, instead of a mere right of action, as formerly held, against the party upon whom the assignment is to be operative, a present right or title to the subject-matter of the assignment, either in existence or having a potential existence, it is equally true that, when the fund upon which the assignment is to operate has only a po-

tential existence, the substantial right of the assignee does not attach to or operate upon any specific fund until the money or property comes within the control of the person who is under legal obligation to deliver it to the assignor, or, if not assigned, could have been demanded by the assignor.

"The equitable doctrine, with respect to the assignment of property to be acquired in the future, is extended to this species of equitable transfer. The fund need not be actually in being; if it exists potentially—that is if it will'in due course of things arise from a contract or arrangement already made or entered into, when the order is given—the order will operate as an equitable assignment of such fund as soon as it is acquired, and will create an interest in it which a court of equity will enforce." Pom. Eq. (3d Ed.) 1283, note (1).

In Kendall v. United States, 7 Wall. 113, 19 L. Ed. 85, Mr. Justice Miller says:

"It is supposed that the doctrine of an equitable assignment of a debt or fund due from one person to another, by the order of the creditor to pay it to a third party, when brought to the notice of the debtor, is a sufficient foundation for the claim. But, if we concede that the government is to be treated in the present case precisely as a private individual, it is not easy to see how that doctrine can be made to apply. The debt or fund as to which such an equitable assignment can be made must be some recognized or definite fund or debt, in the hands of a person who admits the obligation to pay the assignor, or, at least, it must be some liquidated demand, capable of being enforced in a court of justice. We apprehend that the doctrine has never been held that a claim of no fixed amount, nor time or mode of payment. a claim which has never received the assent of the person against whom it is asserted, and which remains to be settled by negotiation or suit at law, can be so assigned as to give the assignor [assignee] an equitable right to prevent the original parties from compromising or adjusting the claim on any terms that may suit them."

The assignee of a contract, or an interest therein, takes only such interest—rights—as his assignor has in the subject-matter of the assignment. This is true, although the assignment is based upon a valuable consideration. 3 Page on Contracts, § 1269; Bispham, Equity (10th Ed.) § 170.

We are thus brought to the consideration of the subject-matter of the assignment made by Wingate to the Farmers' Bank. Conceding that he intended to assign, and used words sufficient to indicate and to express such intention, so much of the money which was to come to him from the anticipated loan as was necessary to discharge the two notes for loans made to him, upon the faith of such expected loan, and that the plan or method of carrying into effect the assignment was agreed upon, that the entire amount of the fund or money coming to him from the loan, when made, was to be deposited in the Farmers' Bank, and that from such deposit the prior liens and mortgages, supposed to be $13,000, were to be first paid off and discharged, and from the balance so deposited the two notes due the Farmers' Bank, aggregating $18,000, were to be discharged, notice of which was given to the Land Bank, the question arises: What—under the then pending negotiation between Wingate and the Land Bank—right, title, or interest in a specified fund, which had only a potential existence, passed to the Farmers' Bank? For the reasons stated, the negotiation with the Land Bank failed—was never consummated. At the time when

Wingate and Clodfelter, cashier, made the arrangement, and the Farmers' Bank made the loan to Wingate, of which the Land Bank was notified, was the Land Bank under legal, enforceable, obligation to Wingate to make the loan? If so, it would seem that the remedy open to the Farmers' Bank, as assignee of a specified portion of the amount to be loaned, would have been an action against the Land Bank to compel the payment of the amount due upon the contract made by the Land Bank with Wingate, to the extent of the Farmers' Bank's interest therein. Pomeroy, Eq. § 1288. If Wingate had acquired a right to enforce the loan, a court of equity would have enforced specific performance at the suit of Wingate and the Farmers' Bank, or awarded damages for breach of the contract. It is not necessary, nor is it intended, to express any opinion upon this question, because it has been put at rest, if ever considered, by the course pursued by Wingate and the Farmers' Bank.

The Land Bank, having declined to make the loan, never had any specific fund out of which the Farmers' Bank could demand or enforce payment of its loans to Wingate. This was recognized by the Farmers' Bank, which does not appear to have made any claim or demand on the Land Bank for the money, based upon the equitable assignment. On December 24, 1920, Mr. Dunn, attorney for the Farmers' Bank, wrote Mr. McKinney, secretary of the Land Bank, the letter set forth in the findings of fact, in which, after reciting the agreement between Clodfelter, cashier, and Wingate, he proceeds to say:

"With the further understanding that if, for any cause, the loan was not consummated, the note would be transferred to the Farmers' Bank, as additional and cumulative security to that given by Wingate to the bank at the time the loan of $18,000 was made."

Following this statement he says:

"As I am advised, the loan from your bank was never consummated, although the note and mortgage from Wingate to you, or the bank, was duly executed, and that the note is now in the possession of your attorney, D. M. Clark, Esq., of Greenville, and the mortgage * * * remains uncanceled of record. Under the above circumstances, the Farmers' Bank is requesting that the note of $37,500 be transferred to it, as additional and cumulative security, and I have advised Mr. Clodfelter that, under the circumstances surrounding the loan of his bank to Wingate, he is clearly entitled to be subrogated to the lien of the mortgage which you hold, in which view I have no doubt that you will agree."

On December 28, 1920, Mr. Dunn again wrote Mr. McKinney, referring to his former letter, and saying that:

"Mr. Wingate has confirmed the statement of the Farmers' Bank and has to-day executed power of attorney to you, directing transfer of the note of $37,500 by you to the Farmers' Bank, and I herewith hand you the power."

In the power of attorney, after reciting the terms of the agreement between Mr. Clodfelter and himself, in September, 1919, in regard to the loan, he proceeds to say:

"And I, the said R. Wingate, promising at said time that, if for any cause I should fail to receive the amount of said loan from said bank, I would cause said bank to transfer the note and mortgage, as additional and collateral security to that given said Farmer's Bank, at the time of said loan by it to me," etc., he directs that the Land Bank "effect the agree-

(297 F.)

ment had with the Farmers' Bank as aforesaid, and give to it the said additional and cumulative security."

He thereupon directs the Land Bank to transfer the note for $37,500 to the Farmers' Bank. It will be observed that, on November 4, 1920, Wingate and wife, executed his two notes to the interveners Smythe Bros. for $26,000 and $25,000, due January 1, 1922, and January 1, 1923, respectively, and on the same day Wingate and wife executed to F. G. James, trustee, for the purpose of securing the payment of said notes, a deed of trust, or mortgage, conveying the same lands included in the mortgage theretofore executed to the Guaranty Title & Trust Company, to secure the contemplated loan by the Land Bank. The deed to James was duly probated and recorded in the office of the register of deeds of Pitt county, December 4, 1920. To have a clear understanding of this phase of the case, it is necessary to refer to the letters from Mr. McKinney in regard to the proposed transfer of the note of $37,500.

On January 3, 1921, McKinney wrote the Federal Farm Loan Board, Washington, D. C., saying that:

"The above [referring to Wingate's case] is the case that remained 'in the mill,' with the hope that it would be 'ground out' and loan duly made, in accordance with the application and the report of the federal appraiser, it already having been approved by him, as well as by our finance committee. It appears that the Farmers' Bank of Greenville, N. C., made advances of approximately $20,000 in anticipation of the proper closing of this loan and the repayment to them of the amount which they advanced in due course. This referred-to bank, through their attorney and an officer of the bank, have lodged with us a proper request, with power of attorney, to assign to them the mortgage from Wingate to this bank, which has been duly recorded."

He asks the board for instructions:

"Is it proper for us to assign the referred-to mortgage to the Farmers' Bank of Greenville? It would seem that they are entitled to the security, at least pending a decision of the Supreme Court whether we are to go on or not. For your information, we are informed that other transactions between Wingate and others have been placed of record, hence the mortgage made to us was filed; otherwise, it would be a more simple way to have the papers canceled and a new mortgage made to the Farmers' Bank."

On February 8, 1922, the Land Bank executed an assignment to the Farmers' Bank of the note executed by Wingate to it for $37,500, reciting the transaction, including the agreement between Wingate and Clodfelter, cashier, of September 19, 1919, as stated by them and further:

"In the event he should fail to receive the amount of said loan from said bank, he would cause said Land Bank to transfer the said note to the Farmers' Bank of Greenville, N. C.," etc.

The assignment was also duly proven and recorded in the office of the register of deeds of Pitt county February 12, 1922. The assignment was also indorsed on the note as herein set forth, and the indorsement reducing the amount to $18,000 made by Mr. Clodfelter, cashier. Wingate was adjudged bankrupt March 2, 1922.

Wingate testified that the agreement between Mr. Clodfelter and himself at the time the loans were made by the Farmers' Bank, was that—

"From the proceeds of the loan which he expected to receive, to be made by the Land Bank, the mortgages then on the land were to be discharged first, and then the loans made by the Farmers' Bank were to be paid; that the money was to be sent to the Farmers' Bank for that purpose."

This is in exact accord with the testimony of Mr. Clodfelter, neither of whom make any reference to the alleged "further agreement that, if the loan was not secured, the note and mortgage which was to be executed to the Land Bank was to be transferred to the Farmers' Bank." Mr. McKinney, the secretary of the Land Bank, and Mr. Clark, who testify as to the statement made to them by Mr. Clodfelter and Mr. Wingate, corroborate the testimony making no reference to the "further agreement."

The only evidence bearing on the question of notice to Smythe Bros., at the time the notes were executed and the deed made to Mr. James, is the testimony of Wingate. He says that he "told them of the Land Bank mortgage and the agreement made with Mr. Clodfelter in regard to the loan made by the Farmers' Bank." There is no contradictory testimony in the record. I heard the witnesses testify. They are all honorable, truthful men, all honestly endeavoring, under difficult financial conditions, brought about by the rapid rise in values during the year 1919 and the disastrous "slump" in 1920, to save themselves from loss.

I am constrained to conclude, from a careful examination of the testimony of the witnesses, who were parties to and made the agreement of September, 1919, and the witnesses to whom they communicated and explained the terms of the agreement, who were interested in and depended upon to execute it together with the conditions under which the agreement was made, its purpose, the reasons which moved the parties to make the agreement, and the failure of either of the parties, who were examined orally before me, to testify that there was any "further agreement" by which, in the event of the failure of Wingate to secure the loan from the Land Bank, the note and mortgage, which were not executed by Wingate until April 1, 1920, seven months after the loans were made by the Farmers' Bank, were to be transferred to the Farmers' Bank "as additional and cumulative security," that there was no such agreement.

The only thing in the record approaching or suggesting evidence of this "further agreement" is found in the letters from Mr. Dunn, attorney for the Farmers' Bank, December 20, 1920, and December 28, 1920, of which, of course, he had no personal knowledge, a year and four months after the agreement was made, followed by the recitals in the power of attorney by Wingate and the assignment February 8, 1922. It is worthy of note that in his letter to the "Federal Farm Loan Board," January 3, 1921, asking for instructions as to assigning the note, Mr. McKinney makes no reference to an agreement that the Land Bank would do so if the loan was not made. He does, however, refer to the fact that "other transactions between Wingate and others have been placed of record." The inference to be drawn from the fact that, 20 days prior to the request to transfer the note, Wingate executed the notes to Smythe Bros. and the mortgage to F. G. James to secure them, recorded December 4, 1920.

The case, then, comes to this: The equitable assignment relied upon by the Farmers' Bank, based upon the admitted agreement of September, 1919, is unavailable, because the Land Bank failed to make the loan to Wingate, and therefore never held for or was liable to him to pay the amount which he endeavored to assign to the Farmers' Bank. The negotiation between Wingate and the Land Bank, upon the success of which the value of the assignment was dependent, failed to be consummated; hence there was never any subject-matter to which the assignment could attach, or could be enforced either by Wingate or the Farmers' Bank. It is unnecessary to consider what effect the alleged "further agreement" would have had as a connecting link between the original agreement and the assignment of the note, February, 1922, by way of subrogation or otherwise.

[4, 5] The claim of the Farmers' Bank derives no aid from the execution of the assignment of the note for several reasons:

(1) The Land Bank had made no loan nor assumed any enforceable obligation to do so; therefore the consideration upon which the note was executed and delivered failed. The Land Bank could not have demanded the amount of the notes of Wingate, nor was it entitled to call on the trustee, the Guaranty Title & Trust Company to execute the trust by selling the property. It could not, by assigning the note to the Farmers' Bank, under the circumstances disclosed by the evidence, confer upon its assignor any other or greater right than it possessed.

(2) Wingate, having on December 4, 1922, executed a deed to F. G. James, trustee, to secure his notes to Smythe Bros., which had been recorded prior to his assignment, he could not, as against the beneficiaries under said deed of trust, create in or confer upon the Farmers' Bank, by his power of attorney directing the Land Bank to assign the note, executed April 1, 1920, upon which nothing had been advanced or loaned, any right to collect the note from the property which he had conveyed to F. G. James, trustee.

I am unable to perceive, upon the facts found regarding the claim asserted by the Farmers' Bank by virtue of the equitable assignment, how any right to the proceeds of the sale as against F. G. James, trustee, and Smythe Bros., can be sustained by way of subrogation. The relation of the Farmers' Bank towards Wingate does not bring its claim to the fund, derived from the sale of the lands, within any principle upon which courts of equity invoke and enforce the doctrine of subrogation. This right is but that of substitution, putting the party in whose behalf subrogation is enforced in the position of the party holding the security, to which the party seeking subrogation, with the securities held by such party, is entitled. If the Land Bank had no rights under the deed to the Guaranty Title & Trust Company, it is difficult to perceive how the Farmers' Bank can, by subrogation or substitution, acquire any better position.

There is, however, a phase of this case which should not be overlooked. Assuming that the contention of the Farmers' Bank could be maintained, all of the parties to the transaction agree in saying that if the loan had been made, and the money loaned transmitted to the Farmers' Bank for disposition, it would have been compelled to first

pay off and discharge the liens and mortgages on the land prior in time to the Land Bank or Guaranty Title & Trust Company mortgage. It was stated by Wingate, in his application for the loan, that these prior mortgages or liens amounted to $13,000; but upon a further examination of the records, after the lands were sold under the decree of the court in this cause, it was ascertained that they amounted to $33,619.23, with certain unpaid taxes and costs. The attorney of the Land Bank was misled by the fact that certain mortgages existed upon the lands when purchased by Wingate, given by his grantors, subject to which Wingate purchased, and did not appear in the "index" as given by Wingate. The lands brought at the sale made by the commissioners $49,500. The difference between the amount to be loaned, less the prior mortgages, taxes, and costs, would have constituted the amount which the Farmers' Bank would have been entitled to apply to its debt against Wingate, if the loan had been made by the Land Bank. The status of the fund, subject to this final decree, is:

Proceeds of sale of land...................................... $49,500.00
Amount prior mortgages........................... $33,619.23
Taxes and cost of sale............................... 1,675.00    $35,294.23
                                                                    ‑
                                                                 $14,205.77

Interest from February 20, 1923.

The difference between the amount for which Wingate negotiated the loan from the Land Bank of $37,500 and the amount of the prior mortgages, taxes, etc., as above, is $2,305.77 which, by agreement between Wingate and the Farmers' Bank of Greenville, would have been applicable to the notes of the Farmers' Bank.

A decree will be signed, directing the commissioners to pay to Smythe Bros., McLeary & McClelland Company, or the present owners of the notes executed by Wingate of $51,000, the sum of $14,205.‑77, which amount will be credited on said notes, and F. G. James, trustee, will execute a release to the purchasers of said land, under decree herein of all right, title, and interest therein, under and by virtue of said mortgage or deed of trust. The commissioners will pay from said fund such costs as have accrued since the last decree herein.