### BANKERS FARM MORTG. CO. v. UNITED STATES.

No. 46430.

Court of Claims.

Jan. 6, 1947.

198

A. D. Sutherland, of Fond du Lac, Wis. (Lawrence J. Bernard, of Washington, D. C., on the brief), for plaintiff.

Donald B. MacGuineas, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

Plaintiff, a Wisconsin corporation organized in 1931, acquired in October and November of that year certain of the outstanding bonds of the par value of approximately $15,554,100 of the Bankers Joint Stock Land Bank of Milwaukee, Wisconsin. The bank defaulted in July 1927 in the payment of interest then due on its outstanding bonds, and, under authority of the Federal Farm Loan Act of July 17, 1916, (39 Stat. 360), was declared insolvent by the Federal Farm Loan Board and placed in the hands of a receiver for liquidation. Plaintiff sues to recover from defendant $7,886,047.04, with interest, representing the principal of certain bonds of the Joint Stock Land Bank which matured in November 1938 and May and November 1939, and past due interest on the outstanding bonds, less 55.27 per centum paid by the receiver in 1933 on the principal or par value of the outstanding bonds to the bondholders in final liquidation of the Joint Stock Land Bank. The principal of certain of the bonds of the insolvent bank acquired by plaintiff and having maturity dates from 1951 to 1955, inclusive, are not included in this suit.

Plaintiff claims that the Joint Stock Land Bank bonds in question are obligations of the United States by reason of the provisions of the Federal Farm Loan Act of July 17, 1916, 39 Stat. 360, 12 U.S.C.A. § 641 et seq., and the facts and circumstances under which they were issued and sold to the public.

The material facts alleged in the amended petition, as the basis of the suit, are as follows:

Plaintiff is the owner and holder for value of $15,771,600 par value of bonds issued by the Bankers Joint Stock Land Bank of Milwaukee (hereinafter sometimes referred to as the "bank"), a corporation which was organized and existed under and pursuant to the Act of Congress of July 17, 1916, 39 Stat. 360, known as the Federal Farm Loan Act, and under and pursuant to the terms of which act said bonds were issued.

The Joint Stock Land Bank on July 1, 1927 failed to pay the interest then due on its outstanding bonds. The Federal Farm Loan Board, by appropriate proceedings, declared the bank to be insolvent and appointed Howard Greene receiver, directing him, as receiver, to take possession of the books, records, and assets of every description of the bank, to collect and account for all debts, dues, and claims belonging to it, and to take such other steps as should be proper and necessary in the premises as the Federal Farm Loan Board might from time to time direct and approve. Thereafter, and prior to February 15, 1933, the receiver completed the liquidation of the assets, and accounted for the proceeds thereof, as hereinafter set forth. On February 15, 1933, the Federal Farm Loan Board directed the receiver to distribute a final liquidating dividend to all creditors whose claims had been proved and allowed, and the receiver made such distribution. The active duties of the receiver, in the liquidation and winding up of the bank, were then completed, but there remained certain duties of an essentially formal character which required attention and the receiver continued to serve in that capacity without compensation from February 15, 1933, until December 28, 1938, on which date he was succeeded by E. Anthony who at all times since has been, and now is, the duly qualified receiver of the bank.

As a result of the receivership and the resulting liquidation the bondholders received an amount equal to 55.27 per centum of the par value of their bonds.

As a part of said bond issue certain bonds of a total of $2,186,600 matured November 1, 1938, May 1, 1939 and November 1, 1939, and are past due and interest on all of said bonds is past due in the sum of $15,065,200 and there is now due and owing principal and interest on said bonds the sum of $17,244,900 less 55.27% paid on the principal thereof, or $7,886,047.04. The balance of said bonds matures at various dates from 1951 to 1955 inclusive.

The bonds being under seal have maturity dates in the years 1938, 1939, and 1951 to 1955, inclusive, and each of the bonds bears interest in amounts respectively from 4½% to 5½% and said interest is due on each bond since January 1, 1927, and for subsequent years, as is evidenced by the coupons attached to each bond.

The face of a typical bond reads:

"Joint Stock Farm Loan Bond
"Act of Congress, Approved July 17, 1916
"M 1480
"The Bankers Joint Stock Land Bank
of Milwaukee, Wisconsin
"Is indebted to the Bearer in
the sum of
"1000     One Thousand Dollars     1000

"This bond is payable twenty years from date of issue with interest at the rate of 5 per centum per annum, payable semi-annually following date of issue. Both principal and interest are payable in gold or lawful money of the United States at the office of the issuing Joint Stock Land Bank, or at the office of such fiscal agent or agents as such Bank may hereafter designate. This bond is subject to redemption on any interest date after five years from the date hereof by the payment of the principal of the bond and the unpaid accrued interest.

"This bond is issued under authority of the Act of Congress approved July 17, 1916, which provides that "farm loan bonds issued under the provisions of this Act, shall be deemed and held to be instrumentalities of the Government of the United States, and as such they and the income derived therefrom shall be exempt from Federal, State, municipal, and local taxation."

"This Bank is organized under Section sixteen of the Federal Farm Loan Act [12 U.S.C.A. §§ 811–823], operates under the provisions thereof, and is under Federal supervision.

"In Witness Whereof The Bankers Joint Stock Land Bank of Milwaukee has caused this obligation to be signed by its President and attested by its Secretary under its corporate seal, and two interest coupon sheets of twenty coupons each to be attached hereto.

"Milwaukee, Wisconsin, May 1, 1919.

"(Illegible),
"President.
"Attest:
"Geo. L. Bartlett,
"Secretary."

The back of each bond contains the following statement:

"This bond is issued under authorization from the Federal Farm Loan Board and is secured by United States Government bonds or approved first mortgages on farm lands at least equal to the amount of the bonds issued.

"F. W. McLean,
"Registrar,
"17th Federal Land Bank District."

A typical interest coupon attached to the bonds reads:

"17                                    $25
"The Bankers Joint Stock Land Bank of Milwaukee, Wis.

"Will Pay to Bearer Twenty-Five Dollars For Six Months' Interest On The First Day of Nov., 1927 On $1,000 Joint Stock Farm Loan Bond
"M 1480                        1924—39"

The Joint Stock Land Bank was organized by citizens of the United States for the purpose of private gain and all of the capital of this corporation was furnished by private investors and the corporation engaged in the loaning of money to farmers for a profit, subject only to the restrictions imposed by the Act of Congress referred to above.

On March 16, 1928, pursuant to an order of the Federal Farm Loan Board, the receiver of the bank gave notice to all persons having claims against the bank, including all bondholders, that all claims, together with proof thereof, must be presented to and filed with the receiver. The notice directed that bondholders, in proving their claims, must deliver their bonds to the receiver. Before the close of 1929, proofs of claim had been duly made by the holders of bonds in the principal amount of $15,554,-500; and thereafter, and prior to February 15, 1933, additional proofs of claim were made by the holders of bonds in the principal amount of $193,100. The receiver issued certificates of proof of claim to all of such bondholders. All bonds which were deposited with proofs of claim remained in the custody of the receiver, subject to the orders of the Federal Farm Loan Board, until after February 15, 1933. The certificates issued by the receiver were transferable, and many of the certificates (approximately 95 percent of the total par value) were issued or transferred to a Bondholders Protective Committee, as the depositary and authorized representative of numerous individual bondholders.

From time to time, proposals were made by various persons to the bondholders, through the medium of the Bondholders Protective Committee, for reorganization of the business of the bank. Shortly prior to April 15, 1931, a group of businessmen, who were holders of substantial amounts of bonds of Bankers Joint Stock Land Bank, organized plaintiff Bankers Farm Mortgage Company, which was incorporated on April 15, 1931, for the purpose of acquiring the outstanding bonds of 'the Bankers Joint Stock Land Bank, and acquiring and liquidating the assets of the bank, and carrying on any other business in connection therewith which the stockholders of the corporation might deem proper to enhance the value of its property. Plaintiff has confined its business solely to the acquisition of bonds of the bank and the acquisition and liquidation of its assets, and has been financed solely from liquidating dividends received on its bonds and from proceeds of the liquidation.

On May 11, 1931, plaintiff sent a circular letter to all known bondholders of Bankers Joint Stock Land Bank, transmitting a prospectus "Plan of Reorganization and Procedure," together with a blank form for subscription to the capital stock of the corporation.

By this prospectus and accompanying letter, plaintiff offered to exchange one share of its nonpar common stock (declared value $40 per share) for each $100 par value of the outstanding bonds of the bank. Subsequently, plaintiff made a supplemental offer to all bondholders, on October 15, 1931, offering, subject to adjustment because of receipt of intervening dividends, either (1) to exchange stock for bonds on the basis aforesaid; or (2) to purchase bonds for 40 percent of the par value thereof, which, added to liquidating dividends of 15 percent theretofore paid by the receiver, would equal 33 cents on the dollar. The offer, as originally made and as subsequently amended, provided that it should become operative only when and if plaintiff acquired, or had the right to acquire, either by exchange or by purchase, 95 percent in principal amount of the outstanding bonds.

On November 4, 1931, plaintiff had acquired or had obtained the right to acquire more than 95 percent in principal amount of all outstanding bonds of the bank. Thereupon, plaintiff's previous offer to purchase the bonds, or to acquire them in exchange for stock, became operative as of November 5, 1931, and on November 18, 1931, the Bondholders' Protective Committee notified its depositors that the plan was operative and in effect as of November 5, 1931. Thereafter, plaintiff issued 45,262 shares of its stock to those bondholders who had elected to take the same in exchange for bonds, at the rate of one share of stock for each $100 principal amount of bonds, subject to adjustment because of receipt of intervening dividends; and plaintiff purchased the remainder of the bonds which it had obtained the right to acquire, by the payment of cash installments aggregating $40 for each $100 principal amount of bonds, subject to adjustments because of receipt of intervening dividends. The total amount of bonds so obtained by plaintiff, through

exchange for stock and through purchase for cash was:

*Bonds, par value*      *Consideration*

     $4,533,100 ......45,262 shares of stock

     $11,021,000 .....$4,323,350.16 in cash (paid in installments).

On July 1, 1932, the receiver issued a notice, and caused it to be duly published, of a public sale to be held on July 29, 1932, of all remaining assets of the bank as of February 29, 1932, with the exception of cash and Government securities on hand.

On July 29, 1932, plaintiff, as sole bidder at the public sale, acquired the remaining assets of the bank, except cash and Government securities on hand as of February 29, 1932, and paid therefor the minimum price specified in the notice of sale, to wit: $2,401,000 plus interest thereon at 3 percent per annum from February 29, 1932, to July 29, 1932. Title to the assets was transferred to plaintiff on August 6, 1932, and, in accordance with the provisions of the notice of sale, all cash collected by the receiver subsequent to February 29, 1932, and up to August 5, 1932, was credited to plaintiff and all expense incurred or paid subsequent to February 29, 1932, and up to August 5, 1932, was charged to plaintiff.

These bonds were originally sold to the public by private underwriters. Printed circulars issued by many of these private underwriters stated in part as follows:

"(1) By Act of Congress, these bonds are declared to be instrumentalities of the United State Government;

"(2) This bank operates under Federal Charter and Government supervision;

"(3) The bonds are engraved and printed in the United States Bureau of Engraving and Printing, under the authority of the United States Treasury; they are declared by the Farm Loan Act and are held by the United States Supreme Court to be 'instrumentalities of the government';

"(4) Its bonds and the mortgages pledged as security have been approved by the Federal Farm Loan Board, a Bureau of the Treasury Department of the United State Government;

"(5) These bonds are legal investment for trust funds in Wisconsin, and are also a legal investment for trust funds under the jurisdiction of the Federal Government, and acceptable as security for Postal Savings and other deposits of Government funds".

Upon the foregoing facts and under the provisions of the Farm Loan Act of July 17, 1916, 39 Stat. 360, particularly section 26 thereof, page 380, 12 U.S.C.A. §§ 931–933, plaintiff insists, as a matter of law, that the Joint Stock Land Bank bonds in question are obligations of the United States for the reasons that (1) the Supreme Court, in Macallen Co. v. Massachusetts, 279 U.S. 620, 49 S.Ct. 432, 73 L.Ed. 874, 65 A.L.R. 866, has held them to be obligations of the United States; (2) that in order for bonds of a private corporation chartered by Congress to be constitutionally exempt from taxation they must first be made obligations of the United States; (3) that the meaning of the phrase "instrumentalities of the Government of the United States" used by Congress in section 26 of the Act, when applied to bonds, is that the bonds shall be deemed and held to be credit instruments of the United States; and (4) that the terms of the act indicate a clear intent that the farm loan bonds be obligations of the United States. In other words, the substance of plaintiff's contention is this: that in order for Congress constitutionally to declare the bonds and securities of the joint stock land banks to be "instrumentalities" of the United States for the purpose of making them, and the income therefrom, exempt from State taxation, such securities must, of necessity, be recognized and treated as obligations of the United States because Congress cannot, by a declaration, create an exemption from State taxation which would not exist under the Constitution independently of such declaration.

■■ We cannot accept the argument of plaintiff that the Joint Stock Land Bank bonds here in question are obligations of the United States, nor can we concur in the proposition advanced by plaintiff as to the limitation on the authority of Congress in view of the decisions in McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579; Osborn v. Bank of the United States, 9 Wheat. 738, 6 L.Ed. 204; Owensboro National Bank v. Owensboro, 173 U.S. 664, 19 S.Ct. 537, 43 L.Ed. 850; Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65

L.Ed. 577, Federal Land Bank v. Crosland, 261 U. S. 374, 43 S.Ct. 385, 67 L.Ed. 703, 29 A.L.R. 1, and Farmers & Mechanics Savings Bank of Minneapolis v. Minnesota, 232 U. S. 516, 34 S.Ct. 354, 58 L.Ed. 706.

The facts alleged in the petition, which are to be considered in connection with the provisions of the Federal Farm Loan Act of 1916, are not sufficient to support the conclusion that the Joint Stock Land Bank bonds are obligations of the United States. Neither the statute nor the bonds contain any express promise by defendant to pay the bonds, or to become liable for any other obligation or debt of the bank, and we think no such obligation can be inferred or implied in the circumstances. The language and history of the Farm Loan Act and the language and promises appearing on the bonds negative any implication of a promise to pay by the Government or the right of the purchasers and holders of the bonds to look to the United States as maker, surety or guarantor. Had Congress intended that the United States should be liable for payment of the bonds or the interest thereon, either originally or upon default of the bank, it seems obvious that it would have used language sufficiently clear to express this purpose, or some indication of that important fact would have been given in the reports on and the explanations of the statute.

The congressional history of the Farm Loan Act shows that Congress considered and discussed the matter of whether, under the terms of the act, the bonds were obligations of the Government and also whether they should be made such obligations, and accepted and acted upon the conclusion, with which everyone seems to have agreed, that they were not such obligations. In addition, the House rejected certain proposed amendments under which the Government would guarantee the payment of interest on the bonds (53 Cong. Rec. 7724), and would also guarantee five percent of the loans on mortgages in lieu of the provision requiring the borrower to purchase stock in the amount of five percent of his loan (53 Cong. Rec. 7972). Another amendment, which was rejected (53 Cong. Rec. 7875), was that the Government in effect underwrite and guarantee the farm loan bonds by purchasing $50,000,000 thereof each year.

In addition to the foregoing, the recorded history of the consideration of the Farm Loan Act in the Senate and the House, as appears from the statements and explanations of the act by members of the committees in charge of the bill, and others, shows very clearly the intention that the farm loan bonds, as well as other obligations of the Federal land banks and the joint stock land banks, should not be obligations of the United States.

In its brief, in opposition to the demurrer, plaintiff cites and relies upon certain discussions in the Senate, between certain Senators and the member of the Committee on Banking and Currency in charge of the Federal Farm Loan Act, with reference to the effect as well as the necessity of the tax exemption provisions contained in section 26 of the Act, as follows:

"Exemption From Taxation

"Sec. 26. That every Federal land bank and every national farm loan association, including the capital and reserve or surplus therein and the income derived therefrom, shall be exempt from Federal, State, municipal, and local taxation, except taxes upon real estate held, purchased, or taken by said bank or association under the provisions of section eleven and section thirteen of this Act. First mortgages executed to Federal land banks, and farm loan bonds issued under the provisions of this Act, shall be deemed and held to be instrumentalities of the Government of the United States, and as such, they and the income derived therefrom shall be exempt from Federal, State, municipal, and local taxation.

"Nothing herein shall prevent the shares in any joint stock land bank from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the State within which the bank is located; but such assessment and taxation shall be in manner and subject to the conditions and limitations contained in section fifty-two hundred and nineteen of the Revised Statutes with reference to the shares of national banking associations.

"Nothing herein shall be construed to exempt the real property of Federal and joint stock land banks and national farm loan associations from either State, county, or municipal taxes, to the same extent, according to its value, as other real property is taxed".

The discussions referred to by plaintiff did not relate to the matter of whether the farm loan bonds would or would not become obligations of the Government by reason of the tax exemption provisions of the statute; that they were not Federal obligations under the terms of the bill seems to have been accepted and agreed to by everyone. The sole point of this discussion in the Senate of section 26 (section 29 of the bill at that time), was that if certain properties, mortgages and bonds referred to in section 26 would be exempt from State and local taxation, such exemption would exist by reason of the relation of the properties to the instrumentalities being created and by force of the Constitution, as applied to the objectives and purposes of the bill and the power and authority being exercised by Congress in authorizing and establishing such instrumentalities to effectuate a national purpose, and not merely by reason of a statutory declaration to that effect. It would seem obvious that the discussion of the effect of the tax exemption provisions of the bill was based upon the belief and understanding that the bonds, mortgages and other debts of the Federal land banks and joint stock land banks would not be obligations of the United States, because in the consideration of the question raised everyone who discussed it accepted without question the proposition that properties and obligations of the United States, and income therefrom, were exempt from state and local taxation without any declaration by Congress to that effect. This has been the established law since the decision in Weston v. City Council of Charleston, 2 Pet. 449, 7 L.Ed. 481.

The constitutionality of the Federal Farm Loan Act, particularly the tax exemption provisions of section 26 thereof, was questioned in Smith v. Kansas City Title Co., 255 U.S. 180, 41 S.Ct. 243, 248, 65 L.Ed. 577. The court sustained the constitutional power of the Congress to authorize the creation of the banks and to make their securities exempt from state and local taxation, on the ground that "Since the decision of the great cases of McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, and Osborn v. Bank, 9 Wheat. 738, 6 L.Ed. 204, it is no longer an open question that Congress may establish banks for national purposes * * *." At page 209 of 255 U.S., at page 248 of 41 S.Ct., the court said,

"That the formation of the bank [United States Bank] was required in the judgment of the Congress for the fiscal operations of the government was a principal consideration upon which Chief Justice Marshall rested the authority to create the bank; and for that purpose being an appropriate measure in the judgment of the Congress, it was held not to be within the authority of the court to question the conclusion reached by the legislative branch of the government.

"Upon the authority of McCulloch v. Maryland, and Osborn v. Bank, the national banking system was established, and upon them this court has rested the constitutionality of the legislation establishing such banks. Farmers' & Mechanics' National Bank v. Dearing, 91 U. S. 29, 33, 34, 23 L.Ed. 196."

Concerning the banks here involved, the court said, 255 U. S. pp. 210 and 211, 41 S. Ct. 249:

"That Congress has seen fit, in making of these banks fiscal agencies and depositaries of public moneys, to grant to them banking powers of a limited character, in nowise detracts from the authority of Congress to use them for the governmental purposes named, if it sees fit to do so. * * *

"In First National Bank [of Bay City] v. [Fellows ex rel. Union] Trust Co., 244 U. S. 416, 37 S.Ct. 734, 61 L.Ed. 1233, L.R. A.1918C, 283, Ann.Cas.1918D, 1169, supra, this court sustained the power of Congress to enable a national bank to transact business, which, by itself considered, might be beyond the power of Congress to authorize. In that case it was held to be within the authority of Congress to permit national banks to exercise, by permission of the Federal Reserve Board, when not in contravention of local law, the office of trustee, ex-

ecutor, administrator or registrar of stocks or bonds.

"We therefore conclude that the creation of these banks, and the grant of authority to them to act for the government as depositaries of public moneys and purchasers of government bonds, brings them within the creative power of Congress although they may be intended, in connection with other privileges and duties, to facilitate the making of loans upon farm security at low rates of interest. This does not destroy the validity of these enactments any more than the general banking powers destroyed the authority of Congress to create the United· States Bank, or the authority given to national banks to carry on additional activities destroyed the authority .of Congress to create those institutions.

" * * * Deciding, as we do, that these institutions have been created by Congress within the exercise of its legitimate authority, we think the power to make the securities here involved tax exempt necessarily follows. This principle was settled in McCulloch v. Maryland, and Osborn v. Bank, supra.

"That the federal government can, if it sees fit to do so, exempt such securities from taxation, seems obvious upon the clearest principles. But, it is said to be an invasion of state authority to extend the tax exemption so as to restrain the power of the state. * * *."

After holding that similar contentions, as to tax exemption being an invasion of State authority, had been rejected in McCulloch v. Maryland, supra, and Owensboro National Bank v. Owensboro, supra, the court said, 255 U. S. page 213, 41 S.Ct. 250:

"The exercise of such taxing power by the states might be so used as to hamper and destroy the exercise of authority conferred by Congress, and this justifies the exemption. If the states can tax these bonds, they may destroy the means provided for obtaining the necessary funds for the future operation of the banks. With the wisdom and policy of this legislation we have nothing to do. Ours is only the function of ascertaining whether Congress in the creation of the banks, and in exempting

these securities from taxation, federal and state, has acted within the limits of its constitutional authority. For the reasons stated, we think the contention of the government, and of the appellees, that these banks are constitutionally organized and the securities here involved legally exempted from taxation, must be sustained."

We think the facts of the case at bar and the principles upon which the Kansas City Title Co. case, supra, and the cases therein cited were decided, established the correctness of the Government's position on the demurrer. However, plaintiff argues that since the Kansas City Title Co. case held the land bank bonds to be "instrumentalities" of the United States they must now be held to be "obligations" of the Government under the decisions in Smith v. Davis, 323 U.S. 111, 114, 115, 65 S.Ct. 157, 89 L.Ed. 107 and Macallen Co. v. Massachusetts, 279 U.S. 620, 49 S.Ct. 432, 73 L.Ed. 874, 65 A.L.R. 866. We think the decisions in the Smith and the Macallen Co. cases, supra, are not applicable here.

The Smith case involved the right of Fulton County, Georgia, to. assess a personal property tax in respect of an open account of a Government contractor for money due from the United States under the contract. The amount due the contractor on the account, as finally determined, was admittedly an obligation of the United States, but the court held that it did not represent such a credit instrumentality of the federal government as would render it constitutionally immune from state and county taxation. Likewise, in describing and comparing the type of credit instrumentalities which the court in the past had recognized as exempt from state taxation, the court was referring to United States obligations.

In the Macallen Co. case the court had for determination the question whether an excise tax measured by net income, imposed under a Massachusetts statute, as amended, was an excise on the privilege of doing business as a corporation, or was in reality a. tax on income from certain tax exempt securities. The securities, the income from which was involved were certain United States Liberty bonds, federal farm loan bonds and certain bonds of Massachusetts

counties and municipalities. The question whether the farm loan bonds were obligations of the United States was not involved, and obviously the court had no occasion to hold that they were such obligations. In the course of the opinion the court referred to the United States Liberty bonds and federal farm loan bonds as "United States securities" and as "federal bonds and securities," but from a reading of the opinion it seems clear that in so doing the court had in mind the fact that these securities had been authorized and issued under and pursuant to acts of Congress, and had no intention of declaring the farm loan bonds to be Federal obligations. The question as to whether or not the farm loan bonds were obligations of the United States was not raised, considered or decided by the court. Webster v. Fall, 266 U.S. 507, 510, 45 S.Ct. 148, 69 L.Ed. 411; United States v. Mitchell, 271 U.S. 9, 14, 46 S.Ct. 418, 70 L.Ed. 799.

We conclude that the declaration by Congress, in section 26 of the Federal Farm Loan Act, that first mortgages and farm loan bonds issued under the act "shall be deemed and held to be instrumentalities of the Government of the United States" did not necessarily make the bonds governmental obligations. The decided cases establish the principle which was applied in Smith v. Kansas City Title Co., supra, that an instrumentality of the United States, although not an obligation, may be exempt from State taxation when, in the exercise of a constitutional power, it is authorized and used by Congress as a means or agency for carrying out a governmental function. The Land Bank bonds in question were instrumentalities of that class. Federal Land Bank of Columbia, South Carolina, v. Gaines, 290 U.S. 247, 254, 54 S.Ct. 168, 78 L.Ed. 298. See, also, Federal Land Bank v. Crosland, 261 U.S. 374, 43 S.Ct. 385, 67 L.Ed. 703, 29 A.L.R. 1 and Federal Land Bank of Columbia v. State Highway Department, 172 S.C. 174, 173 S.E. 284, 288.

The demurrer to the amended petition is sustained and the petition is dismissed. It is so ordered.

WHALEY, Chief Justice, and MADDEN, JONES, and WHITAKER, Judges, concur.